[Crim. No. 22467. Sept. 15, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH CRANDELL, Defendant and Appellant.

844

COUNSEL

John W. Poulos, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert F. Katz, Lauren E. Dana, William R. Weisman and Cynthia Sonns Waldman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUFMAN, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b))[1] from a judgment of death under the 1978 death penalty law (§ 190.1 et seq.). We shall affirm the judgment as to guilt, and as to one of two special circumstance findings, but we shall reverse the judgment as to penalty.

Defendant was charged with the murders of Ernest P. (Ernest) and Edward P. (Edward). The special circumstance of multiple murders (§ 190.2,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

subd. (a)(3)) was alleged as to each murder count. Defendant was also charged with assault with intent to rape and kidnapping of Marie P. (Marie). Defendant was convicted on all counts, the two special circumstance allegations were found to be true, and defendant was sentenced to death.

Marie testified at trial that on July 5, 1980, she was 15 years old and lived in a 1-bedroom house in North Hollywood with her father Ernest, her 14-year-old brother Edward, her 7-year-old sister Kathy P. (Kathy), and defendant Kenneth Crandell (defendant). Marie had known defendant as a family friend as long as she could remember. In February or March of 1980 defendant had begun living with her family because he needed a place to sleep. Defendant was then working in Orange County as a machinist, a job he had obtained with the help of Marie's half-brother Vernon P.

During the evening of July 5, Marie and Kathy went to a friend's house, returning about 10 p.m. Ernest and defendant had been drinking vodka and were engaged in an argument. Ernest accused defendant of cheating at work and defendant denied it. Edward was telling them both to be quiet so he could sleep. Marie took Kathy into the bedroom, closed the door, turned on a fan, and went to bed.

Marie awoke before dawn and went to the kitchen to make coffee. As she walked through the living room, Marie saw her brother face down on the floor, in a place where he often slept. Defendant was awake, seated on a couch. Marie asked where her father was. Defendant said he had gone to a bar. Marie did not believe it and asked again where her father was. Defendant told her Ernest and Edward were both dead. Defendant said he had shot Ernest in the head while holding a pillow over the gun, and had also shot Edward.

Defendant told Marie to remove her clothes. When she refused, defendant showed her a handgun and said: "I will use this again. There's no need stopping now." Marie removed her clothes and defendant got on top of her after dropping his pants to his knees. Defendant said, "Come on, this is my last piece." Defendant attempted intercourse but did not achieve penetration. Defendant got up after approximately two minutes when Marie said, "That's enough."

A few minutes later defendant said: "Don't turn me in 'cause I'll get the gas chamber." Defendant said he would take the bodies to the desert and bury them. He dragged Edward's body to the service porch at the rear of the house. Defendant told Marie to bring him rags, a scrub brush, and a bowl of soap suds. As defendant was scrubbing blood stains from the carpet,

Marie took a cast iron skillet from the stove. Swinging as hard as she could, Marie hit defendant in the head with the skillet. The skillet cracked but defendant appeared unharmed. He said to Marie: "I've got to keep my eye on you now because I can't trust you."

Defendant wanted to leave so he could get money from a friend. Marie woke Kathy and helped her dress. Defendant placed the handgun in a blue airline bag which he carried with him in his automobile. Defendant also brought with him a pillow which had been made by Marie's mother. Marie saw a hole surrounded by a scorched area on one side of the pillow.

Defendant drove to a condominium in Marina del Rey where he talked to a man for a short time. Defendant, Marie, and Kathy stayed at the complex for a few hours while Kathy, who knew nothing of the deaths of her father and brother, swam in the children's pool. Defendant started to drive to his place of employment in Orange County but turned back after making a telephone call. Defendant stopped along the way to throw the pillow into a dumpster.[2] Returning to North Hollywood, defendant borrowed $27 from a friend named Rodolfo Moreno.

Defendant was apparently headed toward Salinas to visit another friend when Marie persuaded him to telephone the friend from her aunt's house in Newhall. While defendant was talking with her aunt and uncle, Marie took Kathy out the back door. They went to a neighbor's house and Marie telephoned the sheriff's department to report the homicides.

Marie's information was relayed to police in North Hollywood who verified there were two bodies on the service porch of the P. house. A surveillance was set up at the house.

From the house of Marie's aunt, defendant drove again to Rodolfo Moreno's house in North Hollywood. According to Moreno's testimony, defendant said he was in "real trouble" and made Moreno promise to help before explaining. After saying he had killed both Ernest and Edward, defendant said he had been fighting with Ernest when Edward intervened and Ernest, enraged, took defendant's gun and shot Edward. Defendant said he then shot Ernest and afterwards tried to choke him. Moreno urged defendant to call the police but defendant said they would never believe him because they would find his fingerprints on the gun. Defendant asked Moreno to help load the bodies into Moreno's pickup and take them to the desert for burial. Moreno agreed out of fear. Defendant touched Moreno with the gun, which

---

[2] Later attempts to recover the pillow were unsuccessful.

was wrapped in rags, saying: ". . . if you trick me I got nothing to lose. I already killed."

Defendant and Moreno drove to the P. house where defendant was stopped and arrested. A .38-caliber revolver, loaded with six live rounds, was found in a blue airline bag in defendant's vehicle.

In a tape-recorded interview that evening, defendant said Ernest had shot Edward when Edward took defendant's side in the argument. Defendant said: "I went over and got the gun and pulled it away from him and I shot him. And he got the gun away from me again, and I grabbed him around the neck, and got him down to the floor, and he went - 'uh - 'uh - uh,' and uh, finally, he just stopped. So then I dragged him out on the back porch."

The autopsy surgeon testified that Ernest's death was caused by a gunshot wound above the right eye and by strangulation. The large size of the entrance wound suggested the gun's muzzle had been very close to the victim's skin. Scraps of fabric and fiber found inside the wound, and the absence of powder burns, were consistent with a pillow having been placed between the gun muzzle and the victim's head. This wound would have caused immediate unconsciousness. Ernest's larynx had been fractured and there was hemorrhage consistent with manual strangulation. Both the strangulation and the gunshot wound were inflicted before death and they could have occurred in either order. Scrapes and contusions on the victim's face and arms could have been caused by a struggle or by being dragged across a floor before death.

A test of Ernest's hands revealed no trace of gunshot residue. His blood-alcohol content at the time of death was between .05 and .07 percent.

Edward was killed by a bullet which entered above and behind the left ear and exited in front of the right ear. The small size of the entrance wound and the absence of powder burns on the victim's skin were consistent with the gun having been fired from a distance. A bullet was recovered from a blood-soaked pillow found on the service porch, indicating that Edward was lying with his head on the pillow when he was shot.

Juan Salasar, a neighbor of the P. family, testified to a conversation with Ernest on July 5 during which Ernest said he did not want defendant to live there any more. Salasar also testified that Edward had stated many times he did not want defendant living there.

Defendant did not testify at trial.

The jury returned verdicts finding defendant guilty of two counts of first degree murder, one count of kidnapping, and one count of assault with intent to commit rape. Defendant was found to have used a firearm in the commission of each offense and two multiple-murder special circumstances were found to be true. The penalty was fixed at death.

## I. COUNSEL ISSUES

Defendant represented himself at the preliminary hearing and at trial without the assistance or advice of counsel. He contends he was forced to undertake self-representation as a result of the failings of his appointed attorney and a series of improper rulings on his requests for competent legal assistance. Although the trial court's failure to exercise discretion on defendant's request for appointment of advisory counsel was error under *People* v. *Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], we have concluded it was harmless under the facts of this case. The other counsel issues, for the reasons which will appear, are without merit.

### A. *Municipal Court Proceedings.*

Defendant moved in superior court under section 995 to set aside the information on the ground that he was denied effective assistance of counsel at the preliminary hearing. The motion was denied and defendant now contends that this ruling was erroneous. This contention requires a review of the proceedings in municipal court.

### 1. *Facts.*

The public defender was appointed to represent defendant on July 9, 1980. The deputy assigned to the case was Sam Gordon. In early September, defendant filed motions in propria persona (pro. per.) for discovery, for allocation of trial preparation funds, and for appointment of an investigator. In the motion papers defendant cited *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].

On September 19, 1980, before the preliminary hearing which ultimately commenced on January 5, 1981, defendant told the court he had not seen Mr. Gordon since July 21 and had received no response to two letters and a telephone message. Defendant had been moved to the pro. per. tank at the jail, apparently by mistake, and had assumed this meant Mr. Gordon was no longer representing him. Referring to Mr. Gordon, defendant stated: "I do waive him as a legal representative of any kind because he has put up no

defense at all for me, none whatsoever, won't even communicate with me." The court set a hearing on the issue of representation for September 22.

In the interim, defendant filed a written notice of motion for appointment of cocounsel. In the moving papers defendant cited section 1095 (two counsel may argue a death penalty case), former section 13 of article I of the California Constitution (a person accused of crime has the right to defend "in person and with counsel"), and Evidence Code section 730 (providing for court appointment of experts).

At the hearing on September 22, the court handed these motion papers to Deputy Public Defender Gordon as attorney of record. Defendant interjected: "Your Honor, I waive Mr. Gordon and the Public Defender as counsel. I want to proceed in pro. per." The court reminded-defendant it was a capital case and it "might not be too prudent" for him to represent himself. The court stated it could not appoint cocounsel for defendant because "the court's powers are limited and this court can only appoint . . . the Los Angeles County Public Defender, and that has already occurred." Defendant replied: "Then I prefer to remain in pro. per. I waive the Public Defender . . . . I have given you the reasons already." Asked to state the reasons again, defendant said Gordon had not communicated with him and had "made no efforts to research the case or to prepare a defense." A recess was then taken to give Mr. Gordon an opportunity to discuss the matter with defendant.

After the recess, defendant again stated he wanted to "waive the Public Defender" and to be "granted pro. per. status." The court reminded defendant that the prosecutor was an experienced lawyer, that self-representation was "almost always" a bad decision, that defendant would receive no special treatment and would be required to follow the normal rules, and that defendant would not have the advice of an experienced criminal lawyer. Defendant stated he understood and the court then granted the motion for self-representation, finding a knowing and intelligent waiver of counsel.

Defendant asked whether lack of funds was the only reason why the court would not appoint a lawyer other than the public defender. Mr. Gordon stated there was no conflict of interest and the court agreed none had been shown. Mr. Gordon then explained that another attorney could be appointed if there were a conflict of interest but not "at the defendant's whim." The court stated that defendant's motion for appointment of cocounsel was denied "for the reasons indicated, that this court cannot afford to appoint an independent lawyer to defend you . . . . This court can only appoint a private lawyer if the Public Defender cannot defend you, and that does not exist in this case."

On October 14, defendant filed a motion for dismissal, arguing that failure to appoint cocounsel to assist him constituted invidious discrimination on the basis of indigency. This motion was denied. The question of representation was again raised on November 18 when defendant orally renewed his motion for cocounsel "or an advisory counsel." The renewed motion was denied.

The preliminary hearing commenced on January 5, 1981. At the outset, the magistrate asked defendant whether he wanted to be represented by the public defender. Defendant replied: "I asked for co-counsel before and I accept co-counsel or advisory counsel." The magistrate stated: "I didn't offer you co-counsel. I offered you counsel to represent you." Defendant answered: "No, I don't want counsel to represent me." The magistrate advised defendant of the dangers of self-representation, after which defendant stated: "I reject the public defender but I do accept co-counsel and advisory counsel." The magistrate commented that the attorneys working for the public defender were "fine lawyers." Defendant stated: "I had the public defender and his opening statement to me was to plead guilty and offered no defense. And I didn't see him for two months, so I rejected him." A recess was taken to permit defendant to discuss the case with Mr. Winckler, another deputy public defender, who stated after the recess that he had explained to defendant the policy of the public defender's office against allowing its attorneys to act as advisory counsel. The magistrate replied: "I had indicated to the defendant I was not going to appoint co-counsel at this stage of the proceeding, that is, just in an advisory capacity, which he seemed to be interested in; but I would offer him the opportunity of having a lawyer represent him." Defendant then reaffirmed his decision to represent himself, stating he intended to call the public defender to ask him to "make an exception to the rule."[3]

## 2. *Marsden and Faretta Issues.*

■ A criminal defendant lacking the means to employ private counsel has a constitutional right to the assistance of court-appointed counsel (*Gideon* v. *Wainwright* (1963) 372 U.S. 335, 342-345 [9 L.Ed.2d 799, 804-806, 83 S.Ct. 792, 93 A.L.R.2d 733]) and this assistance must satisfy certain minimum standards of competence (*United States* v. *Cronic* (1984) 466 U.S. 648, 654-655 [80 L.Ed.2d 657, 664-665, 104 S.Ct. 2039]; *McMann* v. *Richardson* (1970) 397 U.S. 759, 771, fn. 14 [25 L.Ed.2d 763, 773, 90 S.Ct.

---

[3]The "rule" to which defendant referred was apparently the public defender's policy against permitting his deputies to serve as advisory counsel. Whether a trial court could appoint the public defender to act in an advisory role despite such a policy is an issue not presented by this case.

1441]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839]).

■ When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. (*People* v. *Marsden* (1970) 2 Cal.3d 118, 124 [84 Cal.Rptr. 156, 465 P.2d 44].) A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation (*In re Banks* (1971) 4 Cal.3d 337, 342 [93 Cal.Rptr. 591, 482 P.2d 215]) or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 93-94 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476]; cf. *People* v. *Frierson* (1985) 39 Cal.3d 803, 812-814 [218 Cal.Rptr. 73, 705 P.2d 396]).

■ Relying on these principles, defendant contends that his first assertion of inadequate representation triggered a duty by the court to inquire into the adequacy of counsel's performance and, ultimately, to appoint a different attorney. Defendant further contends that the court should have conducted a more thorough inquiry and should have appointed counsel other than the public defender.

During the municipal court proceedings defendant asserted inadequate representation by counsel only as an explanation for his decision to act as his own attorney. ("I do waive [Deputy Public Defender Gordon] as a legal representative of any kind because he has put up no defense at all for me.") A request for advisory counsel (referred to as "co-counsel" in defendant's written motion but apparently intended to act primarily or solely in an advisory capacity) was soon added to the request for self-representation *but defendant did not at any time during the municipal court proceedings seek the appointment of substitute counsel to assume control of his defense.* Aside from indicating he would accept advisory counsel, defendant requested only that he be permitted to represent himself.

■ A criminal defendant has a constitutional right to choose self-representation instead of representation by counsel. (*Faretta* v. *California, supra,* 422 U.S. at pp. 807, 819-821 [45 L.Ed.2d at pp. 566, 572-574].) The only determination a trial court must make when presented with a timely *Faretta* motion is whether the defendant has the mental capacity to waive his constitutional right to representation by an attorney with a realization of the probable risks and consequences. (*People* v. *Joseph* (1983) 34 Cal.3d 936, 943 [196 Cal.Rptr. 339, 671 P.2d 843].) A request for self-representa-

tion does not trigger a duty to conduct a *Marsden* inquiry (*supra,* 2 Cal.3d 118) or to suggest substitution of counsel as an alternative. (*People* v. *Wright* (1977) 72 Cal.App.3d 328, 338-341 [140 Cal.Rptr. 98].)

■ Defendant was fully advised of the dangers of self-representation and he unquestionably had the mental capacity to waive his right to representation by an attorney. Accordingly, the motion for self-representation was properly granted. As no request for substitute counsel was made in municipal court, the *Marsden* procedures were not required. Defendant has failed to demonstrate denial of the right to counsel during the municipal court proceedings.

3. *Advisory Counsel.*

■ Defendant contends that his requests in municipal court for appointment of advisory counsel should have been granted. It is doubtful that this issue is preserved for review as it was not expressly raised in defendant's motion under section 995 to dismiss the information. (See § 996; *People* v. *Harris* (1967) 67 Cal.2d 866, 870 [64 Cal.Rptr. 313, 434 P.2d 609]; *People* v. *White* (1981) 118 Cal.App.3d 767, 773 [173 Cal.Rptr. 575].) Assuming arguendo that the grounds of the motion may be construed to encompass this issue, there is yet another reason making it unnecessary to review the merits of this claim.

We have held that after trial and conviction, error in judicial rulings at or before the preliminary hearing is grounds for reversal only if the defendant demonstrates that the error resulted in denial of a fair trial or otherwise affected the judgment. (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) Application of the rule here makes it unnecessary to decide whether failure to appoint advisory counsel in municipal court was error because defendant makes no showing of prejudice flowing directly from these rulings.[4]

Rather than attempting to demonstrate prejudice, defendant argues that the rule of *Pompa-Ortiz* is unfairly invoked against a pro se defendant who properly challenges municipal court rulings by a section 995 motion to set aside the information but then "ignorantly fails to seek review by writ of

---

[4] The Attorney General contends that the *Pompa-Ortiz* rule applies also to the municipal court *Marsden* and *Faretta* issues. Defendant, in opposition, argues that application of *Pompa-Ortiz* to bar consideration of a claimed denial of the right to counsel at a preliminary hearing would violate the federal Constitution. Our conclusion that no *Marsden* or *Faretta* violations occurred makes it unnecessary to address this constitutional issue. We apply the *Pompa-Ortiz* rule to the advisory counsel issue because no federal constitutional right is implicated. (See *People* v. *Bigelow, supra,* 37 Cal.3d at p. 744-745.)

prohibition in the Court of Appeal." This argument is based on an assumption that the purpose of the *Pompa-Ortiz* rule is "to induce counsel to apply for a pre-trial writ." That assumption is incorrect: the rule of *Pompa-Ortiz* has no purpose other than obedience to the mandate of section 13 of article VI of the California Constitution that a judgment shall not be set aside for error not resulting in a miscarriage of justice.

Defendant's argument also assumes that a self-represented defendant's presumed lack of legal acumen may justify exceptions to the normal rules of appellate review. ▪ There is no authority for this position; on the contrary, it is settled that a pro se defendant may not claim incompetent representation as a basis for reversal on appeal. (*Faretta* v. *California, supra,* 422 U.S. at pp. 834-835, fn. 46 [45 L.Ed.2d at p. 581].) Application of the *Pompa-Ortiz* rule (*supra,* 27 Cal.3d 519) is not unfair in this situation.

Finally, defendant argues that application of the *Pompa-Ortiz* rule will effectively preclude appellate review of municipal court rulings on advisory counsel requests because of the impossibility of assessing prejudice, as recognized in *Bigelow.* (*People* v. *Bigelow, supra,* 37 Cal.3d at p. 745.) This argument is simply incorrect. Rulings of the magistrate at the preliminary hearing are reviewable in the superior court on a motion pursuant to section 995 and pretrial appellate review by petition for writ of prohibition is statutorily available (§ 999a).

B. *Superior Court Proceedings.*

During proceedings in superior court defendant for the first time requested substitute counsel. After much inquiry and discussion the court denied the request for appointment of substitute counsel, as well as defendant's requests for appointment of advisory counsel. Defendant contends that the requirements of *People* v. *Marsden, supra,* 2 Cal.3d 118, were not satisfied, that he did not receive adequate warnings about the dangers of self-representation, that the court erred in not appointing advisory counsel, and that his ejection from a pretrial hearing made it an improper ex parte proceeding.

1. *Facts.*

At his first superior court appearance, on January 22, 1981, defendant requested appointment of Irving Kanarek, an attorney who was then present and willing to accept appointment. The court stated it would appoint the public defender with the understanding that Sam Gordon had been assigned the case. Defendant said he had a "terrific conflict of interest" with

the public defender but Mr. McAllister, a deputy public defender appearing on behalf of Mr. Gordon, denied there was any conflict of interest.

On January 28, defendant again requested appointment of Mr. Kanarek. The court asked defendant to explain why he believed there was a conflict of interest with the public defender. Defendant said Mr. Gordon had done "absolutely nothing," had advised defendant to plead guilty without investigating the case, and had not answered defendant's phone calls or letters. The prosecutor recounted the municipal court proceedings, noting that defendant had requested advisory counsel. The court stated: "No, there is no such thing." The court agreed to set a hearing at which Mr. Gordon would be present but declined to appoint Mr. Kanarek for the limited purpose of representing defendant at the hearing.

At the hearing on February 4, with Deputy Public Defender Gordon present, defendant said Mr. Gordon had provided "ineffective counsel." Mr. Gordon stated there was nothing in the case that would prevent him from doing his best and there was no conflict of interest. Defendant said Mr. Gordon had told him to plead guilty, had conducted no investigation, and had failed to communicate with him. Mr. Gordon assured the court he would take the case to trial if defendant wanted him to do so. The court stated there appeared to be a "personality conflict" rather than a conflict of interest. The prosecutor suggested further inquiry be made of Mr. Gordon regarding defendant's specific charges of inadequate representation. Mr. Gordon denied recommending "that a certain plea bargain might be possible." He admitted there was "a period of a couple of months" when he did not see defendant, after having seen him three times, but he said he believed he was prepared to try the preliminary hearing on the morning when defendant elected self-representation.

A hearing in chambers without the prosecutor was held on the following day. Asked to be as specific as possible, defendant said the policy of the public defender's office seemed to be to plead guilty "before you even find out the facts of the case." Defendant said he began representing himself after he had been placed in the pro. per. section of the jail and after Mr. Gordon failed to meet with him for three weeks. Defendant said that Gordon later explained that defendant had been placed in the pro. per. section of the jail "by accident through a mix-up." Defendant said Gordon admitted he had done nothing on the case. Defendant maintained that Gordon should have requested discovery and should have taken steps to challenge a search warrant. Defendant conceded Gordon had not specifically stated he would not take the case to trial.

Asked to respond, Deputy Public Defender Gordon said he had prepared for the preliminary hearing and had seen defendant three times during

which they had discussed "both trial and alternatives to trial and the fact that the trial itself may be very far down the line." Referring to defendant's assertion that Gordon had advised him to plead guilty, Gordon stated: "I can categorically deny that that conversation ever took place." Gordon said he had discussed with defendant diminished capacity and other possible defenses. He said there was "definitely a disagreement as to tactics," which related to "the fact situation that [defendant] proposed to defend himself on." Asked if he had anything to add, defendant stated: "Well, I just refuse to plead guilty when he tells me that is the thing to do." The court repeated that defendant's only choices, based on what had been presented at the hearing, were representation by the public defender and self-representation.

In open court, with the prosecutor present, defendant said he had asked Deputy Public Defender Winckler to serve as advisory counsel but Winckler had stated it would be against the policy of his office. The court commented: "I wouldn't appoint that kind of counsel anyway." Defendant was again advised at length of the dangers of self-representation, after which he reaffirmed his decision to represent himself.

When the case was called for trial, the court asked defendant whether there was any additional need for the court to try to talk defendant out of self-representation. Defendant said there was no additional need and remarked that he had been trying for over a year to have private counsel appointed. The court asked whether defendant intended to represent himself and defendant answered: "Yes. I have no alternative." Defendant represented himself throughout the trial.

2. *Marsden and Faretta Issues.*

■ ■ ■ ■ When the case first came before the superior court, defendant had been representing himself for some time.[5] He requested appointment of a private attorney, Mr. Kanarek, and stated he would accept appointment of other private counsel but he insisted he would rather represent himself than be represented by Deputy Public Defender Gordon.[6]

[5] In a felony case, neither an appointment of counsel nor a waiver of counsel in municipal court carries over into superior court. (§§ 859, 987; *People* v. *McKenzie* (1983) 34 Cal.3d 616, 635 [194 Cal.Rptr. 462, 668 P.2d 769].) This does not mean, as defendant apparently supposes, that the superior court is required to appoint counsel before considering a defendant's request for self-representation or for appointment of private counsel.

[6] Whether defendant would have accepted appointment of a deputy public defender other than Mr. Gordon is not clear from the record. In municipal court defendant had stated, on September 22, that he "waive[d] Mr. Gordon and the Public Defender as counsel." In superior court, on February 5, he voiced his dissatisfaction with an asserted "policy of the Public Defender's office to plea bargain" and "to plead guilty before you even find out the facts of the case." He also stated: "It is the Public Defender's policy not to put in discovery motions."

What ensued was in the nature of a delayed *Marsden* proceeding (*supra,* 2 Cal.3d 118) to determine whether Mr. Gordon had provided adequate representation while serving as defendant's counsel. Only by establishing grounds not to reappoint Deputy Public Defender Gordon could defendant obtain the appointment of other counsel.

As specific instances of deficient performance, defendant stated that Gordon had failed to conduct an investigation, had advised defendant to plead guilty, and had failed to communicate with defendant. Gordon categorically denied pressuring defendant to plead guilty. Gordon said that he had met with defendant on three occasions, that they had discussed the case and the range of possible defenses, that Gordon had been prepared to try the preliminary hearing which was not then imminent in any event, that there was a disagreement concerning tactics, and that Gordon would take the case to trial if defendant wanted him to do so.

■ Once the defendant is afforded an opportunity to state the reasons for discharging an appointed attorney, the decision to allow a substitution of attorney is within the discretion of the trial judge unless defendant has made a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation. (*People* v. *Smith* (1985) 38 Cal.3d 945, 956 [216 Cal.Rptr. 98, 702 P.2d 180]; *People* v. *Walker* (1976) 18 Cal.3d 232, 238 [133 Cal.Rptr. 520, 555 P.2d 306]; *People* v. *Carr* (1972) 8 Cal.3d 287, 299 [104 Cal.Rptr. 705, 502 P.2d 513].)

■ Defendant was given ample opportunity, on several occasions, to state the reasons for his dissatisfaction with Mr. Gordon, and was urged to be as specific as possible. Defendant's statements, considered with Gordon's responses, did not constitute a substantial showing that Gordon had not provided or would likely not provide constitutionally adequate representation.

The lack of communication during a period of several weeks, after three consultations, did not establish inadequate representation (see *People* v. *Avalos* (1984) 37 Cal.3d 216, 231 [207 Cal.Rptr. 549, 689 P.2d 121]; *People* v. *Walker, supra,* 18 Cal.3d at pp. 237-238), and, given the function and purpose of a preliminary hearing, the court could accept counsel's representation that he was prepared to try the preliminary hearing.

■ A disagreement concerning tactics is likewise insufficient to compel the discharge of appointed counsel, unless it signals a complete breakdown

---

These remarks strongly suggest that defendant would not have accepted representation by any deputy public defender, although apparently he would have accepted Deputy Public Defender Winckler as advisory counsel.

in the attorney-client relationship. (*Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 935 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984]; *People* v. *Williams* (1970) 2 Cal.3d 894, 905-906 [88 Cal.Rptr. 208, 471 P.2d 1008].) In determining whether defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result, trial courts properly recognize that if a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law. A trial court is not required to conclude that an *irreconcilable* conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness. ■ Given *the early stage of the proceeding at which defendant rejected Mr. Gordon's assistance, the trial court could reasonably conclude that defendant had not made sufficient efforts to resolve his differences with Mr. Gordon or given Gordon sufficient time to demonstrate he was worthy of defendant's trust.*

At oral argument before this court, defendant contended for the first time that in fact a conflict of interest did exist that would have precluded the public defender from representing him in the superior court. The court should have inferred from defendant's statements, he argues, an intention to bring a motion under section 995 to set aside the information on grounds which included incompetent representation by Deputy Public Defender Gordon in the municipal court proceedings. Appointing the public defender, it is now urged, would have required the public defender's office to argue the incompetence of one of its own deputies, and thus placed the public defender in a position of conflict. Defendant argues that the court was therefore required to grant his request for appointment of counsel other than the public defender, especially Deputy Gordon.

Defendant's argument is constructed on erroneous assumptions. ■ First, a defendant represented by counsel cannot, as defendant's argument assumes, dictate what motions counsel will bring on his behalf; with a few exceptions, none of which apply here, counsel has authority to control court proceedings. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 314 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Kirkpatrick* (1972) 7 Cal.3d 480, 486 [102 Cal.Rptr. 744, 498 P.2d 992].) ■ Second, a bare assertion that inadequate representation should be urged as a ground for invalidating prior proceedings is insufficient to require appointment of different counsel—a defendant must make at least a "colorable claim" of ineffective assistance of counsel. (*People* v. *Stewart* (1985) 171 Cal.App.3d 388, 396 [217 Cal.Rptr. 306] [new trial motion].) ■ Here the court inquired into defendant's complaints against Gordon in compliance with *Marsden, supra,* 2 Cal.3d

118, and found them baseless. Given this conclusion, the court was not obliged to anticipate a section 995 motion raising the same meritless issue. Finally, of course, our review of the denial of defendant's section 995 motion based on ineffective assistance of counsel has established the lack of merit in any such motion. We conclude that there was no conflict of interest barring appointment of the public defender and that the decision not to appoint private counsel was not an abuse of discretion.

 After denial of the motion to appoint private counsel, defendant was again advised of the dangers of self-representation and, upon defendant's insistence, he was permitted to represent himself. Defendant's waiver of counsel was properly determined to be voluntary.

3. *Advisory Counsel.*

 California courts have discretion to appoint advisory counsel to assist an indigent defendant who elects self-representation. (*People* v. *Bigelow, supra,* 37 Cal.3d 731, 742.) When a defendant requests appointment of advisory counsel, a court's failure to exercise its discretion is serious error and its denial of a request for advisory counsel in a capital case may constitute an abuse of discretion. (*Id.* at p. 743.) We held in *Bigelow* that failure to exercise discretion on a request for advisory counsel *in circumstances where a refusal to grant the request would be an abuse of discretion* requires automatic reversal of a resulting conviction because of the inherent difficulty in assessing prejudice. (*Id.* at pp. 744-746.)

The trial court's discretion to appoint advisory counsel had been acknowledged before *Bigelow* in *People* v. *Mattson* (1959) 51 Cal.2d 777 [336 P.2d 937], but *Mattson* provided little guidance on the exercise of that discretion and, indeed, strongly intimated that appointment of advisory counsel was generally inadvisable. *Mattson* stated that an attorney was "a member of an ancient, honorable and deservingly honored profession," and "entitled to fair consideration," that a trial court "should not appoint counsel—whether to defend an indigent or otherwise—and require of him that in so doing he surrender any of the substantial prerogatives traditionally or by statute attached to his office," and that a defendant had no right to the services of an attorney "as a mere subservient helper under the direction of the accused." (*People* v. *Mattson, supra,* 51 Cal.2d at p. 793.) *Mattson* concluded that appointment of advisory counsel was not required by the California Constitution and bolstered this conclusion with a reference to "the duty of the court to safeguard and promote the orderly and expeditious conduct of its business and to guard against inept procedures and unnecessary indulgences which would tend to hinder, hamper or delay the conduct and dispatch of its proceedings" (p. 792). Given these disparaging refer-

ences to the role of advisory counsel, it is hardly surprising that many judges rejected out of hand requests for appointment of counsel in an advisory capacity.

The concern of *Mattson* that appointment of advisory counsel would demean the profession was unfounded, as is now generally recognized. The role of an attorney rendering expert legal advice to a pro se defendant is similar to, and no more demeaning than, that of an expert appointed under Evidence Code section 730 to render advice in fields such as medicine, psychiatry, or ballistics.[7] A defendant seeking appointment of an expert under Evidence Code section 730 must make a showing of need and the decision to grant or deny the request rests in the sound discretion of the trial court. (*People v. Worthy* (1980) 109 Cal.App.3d 514, 521 [167 Cal.Rptr. 402]; *Collins v. Superior Court* (1977) 74 Cal.App.3d 47, 52 [141 Cal.Rptr. 273].) These same principles govern a request for appointment of advisory counsel.

 Defendant in this case voiced on several occasions a request for appointment of cocounsel or advisory counsel. These requests were summarily denied. On one occasion, when told of defendant's request for advisory counsel, the court stated: "No, there is no such thing." On another occasion, when informed the public defender's office would not accept appointment in an advisory capacity, the court stated: "I wouldn't appoint that kind of counsel anyway." None of the judges who considered the matter expressly acknowledged the existence of discretion to appoint advisory counsel for defendant, and there is no evidence that any judge engaged in a reasoned exercise of judgment based on an examination of the particular circumstances of this case. The failure to exercise discretion was error. (*People v. Bigelow, supra,* 37 Cal.3d at p. 743.)

In *Bigelow,* we concluded that the trial court's error in failing to exercise discretion gained in significance because on the record in that case "it would have been an abuse of discretion to deny the request for advisory counsel." (*People v. Bigelow, supra,* 37 Cal.3d at p. 743.) The Attorney General maintains that the reasons for appointment of advisory counsel were much more compelling in *Bigelow* than in the present case, and that in this case it would *not* have been an abuse of discretion to deny the request for appointment of advisory counsel. We agree.

---

[7] Existing decisional law holds that a defendant's right to the appointment of experts under Evidence Code section 730 does not include the right to appointment of legal experts to assist a defendant in preparing legal arguments (*People v. Smith, supra,* 38 Cal.3d at p. 957), but funds for payment of law clerks and similar ancillary defense services may be obtained by application to the court under section 987.8 or 987.9 (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 321-323 [204 Cal.Rptr. 165, 682 P.2d 360]; *Sand v. Superior Court* (1983) 34 Cal.3d 567, 575 [194 Cal.Rptr. 480, 668 P.2d 787]).

Our recognition of trial court discretion in ruling on a motion for advisory counsel necessarily implies the existence of discretion to deny as well as to grant. A discretion which can be exercised in one way only, or which is shackled by rigid rules regarding its exercise, is no discretion at all. ██ " 'Judicial discretion is that power of decision exercised to the necessary end of awarding justice based upon reason and law but for which decision there is no special governing statute or rule. Discretion implies that in the absence of positive law or fixed rule the judge is to decide a question by his view of expediency or of the demand of equity and justice.' " (*Harris v. Superior Court* (1977) 19 Cal.3d 786, 796 [140 Cal.Rptr. 318, 567 P.2d 750], quoting *People v. Surplice* (1962) 203 Cal.App.2d 784, 791 [21 Cal.Rptr. 826].)

██ *Bigelow, supra,* 37 Cal.3d 731, did not establish a "fixed rule" that advisory counsel must be appointed for every pro se defendant in a capital case, and thus the question whether denial of a request for advisory counsel would have been an abuse of discretion must be determined on a case-by-case basis. "As with all actions by a trial court within the exercise of its discretion, as long as there exists 'a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside, even if, as a question of first impression, we might feel inclined to take a different view from that of the court below as to the propriety of its action.' " (*Gonzales v. Nork* (1978) 20 Cal.3d 500, 507 [143 Cal.Rptr. 240, 573 P.2d 458], quoting *Harrison v. Sutter St. Ry. Co.* (1897) 116 Cal. 156, 161 [47 P. 1019].)

The factors which a court may consider in exercising its discretion on a motion for advisory counsel include the defendant's demonstrated legal abilities and the reasons for seeking appointment of advisory counsel. Where a defendant represented by the public defender has undertaken self-representation only after seeking appointment of private counsel and after having failed to demonstrate proper grounds for appointment of substitute counsel, a request to have private counsel appointed in an advisory capacity might evidence a manipulative endeavor to obtain the appointment of private counsel without a showing of conflict or inadequacy sufficient to remove the public defender in the first instance. Where the record supports an inference of such a manipulative purpose, a court might be justified in denying a request for advisory counsel.[8]

██ As the Attorney General notes, the defendant in *Bigelow, supra,* 37 Cal.3d 731, was a Canadian with only a ninth-grade education and no familiarity with California law, whereas defendant in the present case was

---

[8] We do not know, of course, whether the trial court inferred that defendant was engaged in such manipulative efforts in this case and we do not find it necessary to determine whether the record would support such an inference.

born in California and had an eleventh-grade education. Also, the defendant in *Bigelow* was charged with four special circumstances under the 1978 death penalty initiative, two of which had never been judicially construed and were arguably inapplicable to the defendant's act, while in the present case the defendant was charged only with the multiple-murder special circumstances, which presented no significant construction problems on the facts of this case. While these distinctions are relatively slight, an additional factor sets this case apart from *Bigelow*—defendant in this case demonstrated substantial competence in the municipal court proceedings.

Defendant appeared before the superior court as an obviously intelligent, literate, and articulate advocate in his own cause who had acquitted himself well at the preliminary hearing. He had brought discovery and numerous other motions, had subpoenaed witnesses, and had engaged in skillful examination and cross-examination at the preliminary hearing. Defendant had demonstrated in his motion papers an ability to research the law, to cite applicable precedent, and to engage in reasoned argument. The same judge who dismissed defendant's request for advisory counsel with the remark that "there is no such thing," stated to defendant: "I am well aware how smart you are and how good you are [at] handling your case, so you are not the typical illiterate defendant."

Because this record does not demonstrate that denial of defendant's request for advisory counsel would have been an abuse of discretion, *Bigelow* is distinguishable and its rule of per se reversal does not govern.

The *Faretta* court noted that "a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." (*Faretta* v. *California, supra,* 422 U.S. at p. 835, fn. 46 [45 L.Ed.2d at p. 581]. See also, *McKaskle* v. *Wiggins* (1984) 465 U.S. 168, 184 [79 L.Ed.2d 122, 137, 104 S.Ct. 944].) But the right to the assistance of counsel, guaranteed by the state and federal Constitutions, has never been held to include a right to the appointment of advisory counsel to assist a defendant who voluntarily and knowingly elects self-representation. (*People* v. *Mattson, supra,* 51 Cal.2d 777, 795-796.)

The trial court erred in failing to exercise its discretion on defendant's request for advisory counsel, but where as here a refusal to grant the request would not have been an abuse of discretion, a rule of per se reversal is unnecessary and unwarranted. (Cf. *People* v. *Chavez* (1980) 26 Cal.3d 334, 348-349 [161 Cal.Rptr. 762, 605 P.2d 401] [abuse of discretion in failing to appoint particular attorneys held harmless error].) No federal constitutional right being implicated, the consequences of the error are properly assessed

by employing the *Watson* harmless error standard. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Defendant proved to be an aggressive, thorough, and skillful advocate in superior court. He brought pretrial motions to dismiss the information (§ 995) and to suppress evidence (§ 1538.5). At the hearing on the latter motion, defendant called and examined six witnesses in detail. In preparing for trial defendant used the services of an investigator as well as experts in the fields of pathology, fingerprints, and firearms. Defendant engaged in extensive and relevant voir dire of the prospective jurors, successfully exercising two challenges for cause. Defendant used all of his peremptory challenges, as did the prosecution.

During the trial defendant may have made some tactical decisions that with hindsight appear to have been unwise, but he also engaged in skillful cross-examination of witnesses. During his cross-examination of Marie she confirmed that her father, Ernest, had a history of starting arguments when he drank, that he became a different person when he drank and sometimes became violent, that he had once attacked Marie's mother, that the police had been called to the house "a lot" when Ernest was arguing with Marie's mother, and that Ernest was "abusive and loud" on the night of his death. Defendant also impeached Marie with evidence of prior inconsistent statements. Similar instances of skillful use of cross-examination could be cited in regard to many other witnesses.

In denying defendant's motion for new trial, the trial judge remarked: "Mr. Crandell did a job which absolutely astounded me. And I have been here for as long as I have indicated and I have seen the best come and go. The level of his performance was totally surprising to me. Now, whether it was due to the fact that he had a long time to prepare for his case, and since he was the one on the line, that he paid great attention to it, I am sure that's part of it, or whatever else the sources of his information were, he gave [the prosecutor] Mr. Weisberg a run for his money in this department as far as this Court is concerned. And Mr. Weisberg is a heavyweight. His level of questioning I would compare to a seasoned trial lawyer with at least first degree homicides under his belt by way of defense. That's the kind of job he did here. I don't know what his IQ is and I don't care, because his performance here would put many defense lawyers to shame. His formation of questions on his feet was outstanding. He got the medical examiner in this case to admit he was wrong in his opinions 50 percent of the time. That was a new one for me. I have never seen a skilled lawyer be able to do that. His argument on the theory of how blood was on the feet of one of the two deceased was well-put and logical in its formation. And that's the kind of job he did[.] [I]n this mental appraisal and analysis which I underwent

every day to decide if he was continuously receiving a fair trial[,] [t]he answer was always yes."

Defendant managed to place his version of events before the jury without subjecting himself to cross-examination by relying on his tape-recorded police interview and his other out-of-court statements. Defendant's summation at the guilt and special circumstances phase was lucid and comprehensive. On this record it does not appear reasonably probable that different verdicts would have been returned had defendant received the assistance of advisory counsel.

4. *Defendant's Ejection From the Section 1538.5 Hearing.*

At the hearing on defendant's motion to suppress evidence (§ 1538.5), the parties stipulated to consideration of the testimony taken at the preliminary hearing. In addition, defendant proposed to call several witnesses, including a magistrate who had issued a search warrant. The hearing judge remarked that the magistrate was a personal friend and offered to recuse himself but defendant stated it was unnecessary. The prosecutor remarked that the magistrate who had issued the search warrant had testified twice at the preliminary hearing and the court questioned why additional testimony was needed. Another proposed witness was Mr. Daniels, a former deputy district attorney who had resigned and moved out of state after having been assigned to defendant's case during its early stages. The court questioned both the relevance of Daniels's proposed testimony and whether he had been subpoenaed.

Seven witnesses were called and examined by defendant, after which defendant requested that the magistrate and Mr. Daniels be brought to testify. When the request was denied, defendant accused the court of bias and moved for disqualification, insisting the motion be heard by another judge. The court denied the belated disqualification motion and instructed defendant to proceed. Defendant responded only by challenging the court's jurisdiction. The prosecutor called a witness, after which the court invited rebuttal and argument. Defendant replied by again asserting lack of jurisdiction. The court began reciting its findings on the suppression issues but was repeatedly interrupted by defendant, who was finally removed from the courtroom after disregarding a warning that this would be the consequence of further disruptive behavior. The hearing was concluded in defendant's absence by the recitation of the court's findings.

Defendant contends that conducting any part of the hearing while he was neither present nor represented by counsel was a denial of his right to counsel and automatic reversible error. Defendant does not challenge the ruling on the disqualification motion, the rulings declining to compel the

attendance of witnesses, or the ruling on the merits of the suppression motion, nor does defendant challenge the action of the court in ejecting him for disruptive behavior. Defendant contends only that the court was powerless to proceed with the hearing in defendant's absence without appointing counsel to represent him.

We find no error. Both the evidentiary and argument phases of the hearing were concluded in defendant's presence. Nothing remained but announcement of the court's ruling. Absent a showing of at least a possibility of prejudice, reversal is not required where a defendant is unrepresented at a pretrial proceeding during which nothing occurs other than the announcement of a ruling. (*People v. Tahtinen* (1958) 50 Cal.2d 127, 135 [323 P.2d 442] [setting of date for retrial]; *People v. Rice* (1887) 73 Cal. 220, 221-222 [14 P. 851] [ruling on demurrer].)

## II. GUILT ISSUES

### A. *Evidence of Premeditation and Deliberation.*

Defendant contends there was insufficient evidence of premeditation and deliberation to support the verdicts of first degree murder.

Evidence sufficient to sustain a finding of premeditation and deliberation "falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of a 'pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], original italics.)

A verdict of first degree murder based on premeditation and deliberation will be sustained "when there is evidence of all three types" or "extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson, supra,* 70 Cal.2d at p. 27.) Here the

evidence presented included all three categories, and the evidence in categories (2) and (3) was undoubtedly sufficient to sustain the judgment.

Evidence of planning activity was presented by the testimony of Juan Salasar, a neighbor of the P. family, who stated that on the evening of July 5, while both the door and a window of the P. house were open, he heard defendant arguing with Ernest and heard Ernest loudly tell defendant to get out. Salasar testified that defendant then "turned the television up very loud" and proceeded to close the door and the window and to draw the curtains, after which Salasar heard "just silence . . . absolutely nothing." Considered with the evidence that at least one of the fatal gunshots, and possibly both, were fired through a pillow, the evidence that defendant turned up the television, closed the door and window, and drew the curtains was evidence of planning activity to avoid detection of the intended crimes.

Defendant argues that this evidence is insignificant because there was no testimony that it was unusual for him to close the door and window at night, or to draw the curtain, and that these are common household tasks with no sinister significance. In addition, he points to the testimony of Juan Salasar's wife, who recalled hearing the sound of an air conditioner at the P. house. Closing the window and turning up the volume of the television can be explained, defendant argues, by the simultaneous activation of a noisy air conditioner on a hot night, or by a desire to prevent neighbors from hearing the argument.

The points raised by defendant go to the weight of the evidence and were proper matters for the jury to consider but the evidence is nonetheless evidence of planning activity. While there was no evidence that defendant's actions were unusual for him, neither was there evidence that they conformed to a habit or custom. Similarly, there was no evidence that the air conditioner was turned on at the same time that the television volume was increased and the door and window closed. Viewed as a whole and in context, Salasar's testimony provided some evidence of planning activity.

The manner of killing was very clear evidence of deliberation and premeditation. Edward was shot through the head from above as he was lying on the floor with his head on a pillow. Ernest was shot while the gun was pressed against a pillow and the pillow was pressed against Ernest's forehead. Both wounds are inconsistent with the existence of a struggle and entirely consistent with the particular and exacting execution of helpless victims. Ernest was also strangled. Although it was impossible to determine from medical evidence whether the shot preceded the strangulation, there is no reason to disbelieve defendant's statements to different witnesses that he strangled Ernest after shooting him because the shot was not immediately

fatal. The evidence was uncontradicted that the shot would have immediately rendered the victim unconscious.

Ernest's accusation that defendant was cheating at work, their prolonged argument, and Ernest's demand that defendant leave the P. household provided motives for defendant's killing of Ernest. Edward may have been killed because he also wanted defendant to leave or because he was an actual or potential witness to the killing of Ernest. The evidence of motive was substantial. The record amply supports the two verdicts of premeditated and deliberated murder.

### B. *Jury Instructions.*

### 1. *Flight After Commission of Crime.*

 Defendant contends there was insufficient evidence to warrant an instruction that flight after commission of a crime, or after accusation, supports an inference of guilt.[9] He maintains it was shown by uncontradicted evidence that he left the P. house after the homicides for reasons other than fear of immediate apprehension and with the intention to return to dispose of the bodies. Accordingly, he argues that his leaving was not flight.

 An instruction on flight is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt, and flight requires neither the physical act of running nor the reaching of a faraway haven. (*People* v. *Cannady* (1972) 8 Cal.3d 379, 391 [105 Cal.Rptr. 129, 503 P.2d 585].) Flight manifestly does require, however, a purpose to avoid being observed or arrested.

 Although defendant left the P. house without reporting the deaths of Ernest and Edward and with the purpose of concealing their deaths, and although this conduct supported an inference of consciousness of guilt, his leaving was not flight in the absence of any evidence from which a jury could reasonably infer that he left to avoid being observed or arrested. Defendant did not leave to avoid being observed (his presence at the house on the morning following the murders was already known to Juan Salasar, among others) and he did not expect the crimes to become known before his intended return. He left to accomplish specific tasks and with the intent of returning to dispose of the bodies. There is no evidence he ever wavered in

---

[9]CALJIC No. 2.52 (1979 rev.) states: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

This language is prescribed by section 1127c.

this intent; indeed, he was arrested while returning and less than a block from the P. house. Accordingly, the instruction on flight should not have been given.

However, the error was manifestly harmless. The instruction did not figure in the prosecutor's closing argument and defendant's conduct, though not constituting flight, did manifest consciousness of guilt. Finally, the instruction did not posit the existence of flight; both the existence and significance of flight were left to the jury. (See *People* v. *Clem* (1980) 104 Cal.App.3d 337, 344 [163 Cal.Rptr. 553].) It is not reasonably probable a verdict more favorable to defendant would have resulted had the instruction not been given.

2. *False Statements and Suppression of Evidence.*

The jury was instructed that a false or deliberately misleading statement by defendant concerning the charge upon which he was being tried (CAL-JIC No. 2.03) or an attempt by defendant to suppress evidence against himself such as by destroying evidence or by the intimidation of a witness (CALJIC No. 2.06) could be considered "to prove a consciousness of guilt" but was not "sufficient of itself to prove guilt" and that its weight and significance, "if any," were matters for the jury's determination.

■ Defendant raises several contentions concerning these instructions, the first being that the phrase regarding intimidation of a witness should have been stricken because there was no evidence of such conduct. We disagree. Rodolfo Moreno testified that after defendant had requested Moreno's help in disposing of the victims' bodies, defendant had voiced a suspicion that Moreno "just wanted to turn [defendant] in." Moreno insisted this was not true, and defendant reportedly replied: "Remember, you promise to help me. Follow me. And don't let anybody—don't trick me because if you trick me—you promise to help me, so if you trick me I got nothing to lose. I already killed. I have nothing to lose." This was evidence that defendant attempted to intimidate Moreno to prevent him from reporting defendant to the authorities, and was a sufficient basis for the instruction. (*People* v. *Rance* (1980) 106 Cal.App.3d 245, 251 [164 Cal.Rptr. 822].)

■ Next defendant contends the trial court was required to limit the instructions to the murder charges because there was no evidence of false statements or attempts to suppress evidence relating to the kidnapping and assault charges. The instructions do not assume the existence of evidence relating to each charge; they merely instruct the jury on the use of such evidence should it be found to exist. Accordingly, the instructions were neither erroneous nor irrelevant. If defendant desired limitation or clar-

ification of the instructions, it was incumbent upon him to request it. (See *People* v. *Forbs* (1965) 62 Cal.2d 847, 854 [44 Cal.Rptr. 753, 402 P.2d 825].)

Defendant's remaining arguments focus on the phrase "consciousness of guilt." A defendant's "guilt" being the ultimate determination of the truth or falsity of the criminal charges, the jury might, according to defendant, view "consciousness of guilt" as equivalent to a confession, establishing all elements of the charged murder offenses, including premeditation and deliberation, though defendant might be conscious only of having committed some form of unlawful homicide. The instructions thus permitted the jury, defendant maintains, to draw an impermissible inference, without foundation in reason or experience, concerning his mental state at the time of the homicides, thereby violating his federal due process rights. (See *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450]; *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [44 L.Ed.2d 508, 95 S.Ct. 1881]; *United States* v. *Gainey* (1965) 380 U.S. 63 [13 L.Ed.2d 658, 85 S.Ct. 754].)

Defendant's fear that the jury might have confused the psychological and legal meanings of "guilt" is unwarranted. A reasonable juror would understand "consciousness of guilt" to mean "consciousness of some wrongdoing" rather than "consciousness of having committed the specific offense charged." The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto.

No error appears in the giving of CALJIC Nos. 2.03 and 2.06.

3. *Self-defense Instructions.*

a. *Initial Aggressor.*

 Defendant contends it was error to give CALJIC No. 5.54 describing an aggressor's duty to withdraw before engaging in self-defense. He maintains that the instruction is inapplicable under the evidence presented at trial and erroneous in failing to distinguish between deadly and nondeadly force.

 An aggressor who uses deadly force must "not only endeavor to really and in good faith withdraw from the combat, but he must make known his intentions to his adversary." (*People* v. *Button* (1895) 106 Cal. 628, 632 [39 P. 1073].) An aggressor using nondeadly force, on the other hand, who meets with deadly force in response, is not required to communi-

cate an intent to withdraw and is required to retreat only if circumstances permit. (*People* v. *Hecker* (1895) 109 Cal. 451, 464 [42 P. 307]; see also, *People* v. *Roe* (1922) 189 Cal. 548, 557-558 [209 P. 560].)

The challenged instruction describes the steps which must be taken before "a person who was originally an assailant" may employ force in self-defense. The original assailant must "really and in good faith endeavor to decline further combat and fairly and clearly inform his adversary of his desire for peace and that he has abandoned the contest." The instruction is correct if the original aggressor employs deadly force but erroneous as applied to a situation where deadly force is employed in response to a simple assault.

 Defendant maintains there was no substantial evidence he was an initial aggressor who thereafter was assaulted and thus he contends that no instruction on this topic should have been given. He asserts he was prejudiced because the jury, in an attempt to give meaning to the instruction, might have speculated, based on the bruises and scrapes found on Ernest's body, that defendant inflicted those injuries by the use of nondeadly force in an initial act of aggression which prompted Ernest to respond by threatening defendant with defendant's revolver. The jury would then have concluded from the instruction that he was required to retreat and to communicate his intent to withdraw. As there was no evidence of either attempted retreat or communication, defendant concludes, the jury may have rejected his self-defense theory by a chain of reasoning which was both legally and factually incorrect.

We agree, as does the Attorney General, that the instruction was unsupported by the evidence and should not have been given, but we perceive no prejudice. It is not reasonably probable that the jury engaged in speculation, as defendant suggests, or that the instruction in any manner interfered with the jury's consideration of the self-defense theory on which defendant relied at trial, under which Ernest was the initial and sole aggressor.

b. *Intentionally Created Necessity.*

 Defendant also contends it was error, due to the absence of supporting evidence, to give CALJIC No. 5.55, which states that the right to self-defense is not available to one who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense. The harm of the instruction, defendant argues, is that it invites the jury to speculate on the existence of a situation which would, if established, justify the rejection of his only defense to the murder charges.

Again, we agree that the instruction should not have been given but we are confident the jury was not sidetracked by the correct but irrelevant

instruction, which did not figure in the closing arguments, and we conclude that the giving of the instruction was harmless error. (See *People* v. *Rollo* (1977) 20 Cal.3d 109, 123 [141 Cal.Rptr. 177, 569 P.2d 771]; *Solgaard* v. *Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 371 [99 Cal.Rptr. 29, 491 P.2d 821].)

c. *Apparently Disabled Assailant.*

■■■■ Defendant challenges the following instruction as being erroneous, confusing, and incomplete:

"The right of self-defense ceases to exist when there is no longer any apparent danger of further violence on the part of an assailant. Thus where a person is attacked under circumstances which justify his exercise of the right of self-defense, and thereafter he uses such force upon his attacker as to render the attacker incapable of inflicting further injuries, the law of self-defense then ceases to work in favor of the person attacked." (CALJIC No. 5.53.)

As defendant points out, the first sentence is a correct statement of the law but the second sentence, intended as a specific illustration, omits the important qualification that the danger need only be apparent rather than real.[10] This omission is particularly significant in the present case, defendant maintains, because of his statements, received in evidence at trial, that he strangled Ernest after shooting him. According to the testimony of the autopsy surgeon, the gunshot wound would have caused immediate unconsciousness and thus rendered Ernest incapable of inflicting further injuries on defendant. The danger perceived by defendant is that the jury, after concluding that he acted in self-defense in shooting Ernest, may have based the murder conviction on the act of strangulation without pausing to consider whether defendant believed, either reasonably or unreasonably, that he was still in imminent peril.[11]

The jury was instructed, in the language of CALJIC No. 5.51 (1977 rev.), that the right of self-defense is the same whether the perceived danger is real or only apparent, so long as the defendant entertains an honest and reasonable belief in the necessity for self-defense. The jury was also instructed, in the language of CALJIC No. 5.17, that an honest but unreasonable belief in the existence of imminent peril is not a complete defense but reduces a

---

[10] This deficiency was addressed when CALJIC No. 5.53 was revised in 1983; the word "apparently" has been added to the second sentence of the instruction.

[11] Defendant stated in his tape-recorded interview, however, that Ernest regained control of the gun after being shot and before being strangled. This improbable version, if true, would have presented defendant with a situation of actual and not merely apparent peril.

criminal homicide from murder to manslaughter. (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 674-680 [160 Cal.Rptr. 84, 603 P.2d 1].)

■ "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] '[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial.' [Citation.] 'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' [Citation.]" (*People* v. *Burgener* (1986) 41 Cal.3d 505, 538-539 [224 Cal.Rptr. 112, 714 P.2d 1251].)

■ Viewing the charge as a whole, it is not reasonably probable that the jury was confused regarding the law of self-defense as it relates to a defendant's reasonable or unreasonable belief in imminent peril when the defendant's attacker has become incapacitated.

In concluding that no prejudice resulted from any of the claimed errors related to instructions on self-defense, we have considered, in addition to the specific factors previously mentioned, that the jury convicted defendant of the murder of Edward P. as well as the murder of Ernest P., and that both murders were found to have been committed with premeditation and deliberation. These verdicts indicate a complete rejection of the evidence on which defendant relied to establish self-defense.

4. *Unanimity Requirement.*

■ Relying on *People* v. *Dellinger* (1984) 163 Cal.App.3d 284 [209 Cal.Rptr. 503], defendant contends that the court was obligated to instruct sua sponte that before finding defendant guilty of the murder of Ernest, the jurors had to agree unanimously on the act or acts which caused his death. Defendant maintains that the instruction was made mandatory by evidence that Ernest's death could have resulted from either the gunshot wound or the strangulation, or from the combined effects of both injuries.

In *Dellinger* the defendant's conviction for the first degree murder of a two-year-old child was reversed on several grounds, one being the failure to give a unanimity instruction. Since the evidence showed multiple traumatic injuries as well as ingestion of a potentially lethal quantity of cocaine, the case was argued to the jury on both poisoning and traumatic injury theories. The court stated: ". . . there were several hypotheses as to which act or acts caused [the child's] death. As long as there are multiple acts presented to the jury which could constitute the charged offense, a defendant is enti-

tled to an instruction on unanimity." (*People* v. *Dellinger, supra,* 163 Cal.App.3d at p. 301.)

Here, unlike *Dellinger,* there was no uncertainty as to whether defendant committed each of the potentially lethal acts: the evidence was undisputed that defendant both shot and strangled Ernest. The only plausible basis for requiring the unanimity instruction would be that the evidence regarding self-defense differed as to the two injuries. Under this hypothesis, a guilty verdict would require unanimous juror agreement on two points: first, that the particular act (either shooting or strangulation) was a cause (either sole or concurrent) of the death of Ernest and, second, that defendant did not have the privilege of self-defense when he committed the act.

■■■ The unanimity instruction is not required when the acts are so closely connected in time as to form part of one transaction. (*People* v. *Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971]; *People* v. *Thompson* (1984) 160 Cal.App.3d 220, 224 [206 Cal.Rptr. 516]; *People* v. *Turner* (1983) 145 Cal.App.3d 658, 681 [193 Cal.Rptr. 614].) This branch of the "continuous conduct" exception (*People* v. *Diedrich, supra,* at pp. 281-282) applies if the defendant tenders the same defense or defenses to each act and if there is no reasonable basis for the jury to distinguish between them. (See *People* v. *Parsons* (1984) 156 Cal.App.3d 1165, 1174 [203 Cal.Rptr. 412]; *People* v. *Deletto* (1983) 147 Cal.App.3d 458, 469 [195 Cal.Rptr. 233].)

■■■ We need not decide in this case whether the self-defense evidence was sufficiently different as to each act, and of sufficient weight, to mandate the instruction on unanimity. Assuming arguendo that failure to give the instruction was error, no prejudice resulted. As previously mentioned, the jury found by its verdicts that Edward was killed by defendant, not by Ernest, and that defendant *deliberated* and *premeditated* both homicides. These verdicts necessarily imply a complete rejection of all the self-defense evidence presented by defendant. Thus any difference in the self-defense evidence as to the shooting and strangulation of Ernest was without significance and no prejudice could have resulted from the omission of a unanimity instruction.

5. *How Intent Is Shown.*

■■■ The jury was instructed in the language of CALJIC No. 3.34 (1979 rev.) that the intent with which an act is done is shown by "the circumstances attending the act, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing the act." The court omitted from the instruction the provision stating that

intent is also shown by "a statement of his intent made by a defendant." Defendant contends that the omission constituted prejudicial error because there was evidence of statements he made regarding his intent at the time of the homicides and a reasonable juror would have understood the instruction given as excluding such statements from consideration on the issue of intent.

The statements to which defendant refers were not statements of intent. Defendant did not directly state that he did or did not intend to kill Ernest, did or did not intend to save his own life. Rather, his statements were descriptive of the "circumstances attending the act" and thus were not excluded from consideration by the instruction. The instruction is not ambiguous, does not state or imply that defendant's statements should be disregarded on the issue of intent, and is not susceptible to a construction barring consideration of the statements of defendant received in evidence in this case.

## 6. *Self-representation.*

 Defendant contends that the trial court erred in failing to draft and give sua sponte a jury instruction stating that self-representation is a constitutional right and that no adverse inference should be drawn from exercise of the right.[12] Defendant asserts that such an instruction is necessary to protect the exercise of the right and that authority for a duty to give such an instruction can be derived from the analogous situation of a defendant who exercises the privilege not to testify at trial.

Defendant argues that instructing a jury in the language of CALJIC No. 2.06 (1979 rev.), as was done in this case, may cause the jury to draw adverse inferences from a pro se defendant's courtroom behavior. The instruction in question states that attempts by a defendant to suppress evidence or intimidate a witness may be considered as a circumstance tending to show consciousness of guilt. Defendant asserts that vigorous cross-examination could be viewed as attempted intimidation of witnesses and routine objections as attempted suppression of evidence. According to defendant, a properly worded instruction on the right of self-representation could avoid these misconceptions.

---

[12] Defendant proposes the jury be instructed in substantially the following terms:

"It is a constitutional right of a defendant in a criminal trial to represent himself. You must not draw any inference from the fact that he has represented himself in this trial. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way.

"What the Deputy District Attorney and the defendant have done in this courtroom to represent the people and the defense in this trial is not evidence. Evidence is the testimony, [any stipulations agreed to by the parties] and the exhibits in the case and nothing else."

■ If a criminal defendant does not testify, the trial court is required, on the defendant's request, to inform the jury of the privilege against self-incrimination and to instruct them to draw no inference of guilt from the exercise of the privilege. (*Carter* v. *Kentucky* (1981) 450 U.S. 288, 305 [67 L.Ed.2d 241, 254, 101 S.Ct. 1112].) ■ Defendant maintains that the privilege of self-representation is similar to the privilege against self-incrimination, and that the jury should accordingly be instructed to draw no inference adverse to a defendant from the defendant's exercise of the right of self-representation. Defendant insists that the trial court had a duty to give such an instruction sua sponte.

We are not persuaded. While both the failure to testify and the failure to accept representation by counsel are likely to arouse the curiosity of jurors, the resulting risks differ materially. ■ Because the defendant is a logical defense witness, a jury may "give evidentiary weight to a defendant's failure to testify." (*Carter* v. *Kentucky, supra,* 450 U.S. at p. 305 [67 L.Ed.2d at p. 254].) A defendant's election of self-representation has no comparable evidentiary significance.

Even if the analogy were exact, moreover, it would not help defendant, because there is no duty to instruct sua sponte on a defendant's failure to testify. (*People* v. *Gardner* (1969) 71 Cal.2d 843, 854 [79 Cal.Rptr. 743, 457 P.2d 575].) ■ Whether there is any advantage to the defendant in giving the instruction "manifestly is debatable" (*ibid.*) because instructions of this nature may "have the effect of highlighting the very fact they are intended to minimize" (*People* v. *Mendoza* (1987) 192 Cal.App.3d 667, 678 [238 Cal.Rptr. 1]). The benefit of an instruction on self-representation is debatable for the same reason. Absent a request by defendant, the trial court was not required to instruct the jury to draw no adverse inference from defendant's exercise of the right of self-representation.

C. *Prosecutorial Misconduct (Doyle Error).*

■ Defendant contends that the prosecutor committed misconduct during argument by calling the jury's attention to defendant's exercise of his right to counsel during a taped interview with police shortly after his arrest. Defendant contends that the argument violated his federal due process rights and requires reversal under *Wainwright* v. *Greenfield* (1986) 474 U.S. 284 [88 L.Ed.2d 623, 106 S.Ct. 634].

At the outset of the interview, when asked if he knew what his rights were, defendant responded: "To pay taxes, to die, and uh—what else?" When defendant was advised of his rights per *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], defendant

said he wanted an attorney and also a bail bondsman, but he was willing to talk to the interviewing officers without an attorney present.[13]

The prosecutor, in his summation, suggested the jury play the tape during deliberations. He then stated: "Listen to his [i.e., defendant's] tone of voice. . . . Listen to when he's advised of his constitutional rights; when he's saying, 'Yeah, I want a lawyer. I want bail. I want a lawyer. I want to get bail.' . . . Listen to him when he is advised of his rights and what his attitude is. Here is a man who has been the victim of this horrendous thing where he has seen his, apparently his best friend, shoot this boy he claims that was so close to him, although no witness who testified in the trial has come close to saying Edward was this close and an ever-present companion that Mr. Crandell wants you to believe that he was. And how is this person talking to the police at his first opportunity after he has in self-defense, his allegation, shot and killed his best friend? He's advised of his rights. 'Do you know what your rights are?' 'To pay taxes, to die and what else?' Now, that is the attitude of that fellow who has just been brought in on this serious charge, and that's his flippant response."

*Wainwright* v. *Greenfield, supra,* 474 U.S. 284, concerned a prosecutor's argument to the jury that the defendant's repeated refusals to answer questions without first consulting an attorney demonstrated a degree of comprehension inconsistent with the defendant's claim of insanity. This argument was held to be a violation of federal due process rights under the reasoning of *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240].

■ *Wainwright* and *Doyle* are founded on the notion that it is fundamentally unfair to use post-*Miranda* silence against the defendant at trial in view of the implicit assurance contained in the *Miranda* warnings that exercise of the right of silence will not be penalized. (*Wainwright* v. *Greenfield, supra,* 474 U.S. at p. 295 [88 L.Ed.2d at p. 629, 106 S.Ct. at p. 638].) A similar process of reasoning supports the conclusion that comment which penalizes exercise of the right to counsel is also prohibited. (*People* v. *Fabert* (1982) 127 Cal.App.3d 604, 610-611 [179 Cal.Rptr. 702]; *People* v. *Schindler* (1980) 114 Cal.App.3d 178, 188-189 [170 Cal.Rptr. 461].)

■ Here the evidence of defendant's invocation of the right to counsel was received without objection and the remarks of the prosecutor did not invite the jury to draw any adverse inference from either the *fact* or the *timing* of defendant's exercise of his constitutional right. The prosecutor mentioned the invocation of counsel primarily as a point of reference within

---

[13] No *Miranda* violation is claimed.

the taped interview to assist the jury in locating an area where the prosecution believed that the *tone* of defendant's statements, and particularly his references to the "rights" to die and pay taxes, appeared to be inconsistent with defendant's statements about the events of the preceding night and about his relationships with the two decedents. In *Wainwright* it was not contested that "a prosecutor may legitimately inquire into and comment upon 'purely "demeanor" or "behavior" evidence.'" (474 U.S. at p. 295, fn. 13 [88 L.Ed.2d at p. 632, 106 S.Ct. at p. 641, fn. 13].)

In any event, if the remarks had the objectionable effect of drawing the jury's attention to the exercise of protected rights, the verdicts were certainly not affected by this "brief and mild" reference to matters already properly received in evidence and any error was manifestly harmless beyond a reasonable doubt. (See *People* v. *Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Jackson, supra,* 28 Cal.3d 264, 304-305; *People* v. *Vargas* (1973) 9 Cal.3d 470, 478-481 [108 Cal.Rptr. 15, 509 P.2d 959]).[14]

### III. SPECIAL CIRCUMSTANCE ISSUES

#### A. *Mens Rea and Concurrence.*

Defendant was charged with two multiple-murder special circumstances as defined in subdivision (a)(3) of section 190.2: "The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree." Defendant contends that this special circumstance has "the unique structure of a crime" including both mens rea and actus reus. The mens rea is argued to be, not just general criminal intent, but the specific intent to plan to commit more than one murder, or to kill the victim of a first degree murder knowing the same conduct is likely to result in the death of at least one other person, or to kill the victim of the first degree murder with knowledge of having previously committed a murder of the first or second degree. In the same vein, defendant contends that the act and the intent must be concurrent, and thus the special circumstance does not apply to a second degree murder committed after a first degree murder unless the second degree murder was already contemplated in some fashion when the first degree murder was committed.

To the extent these contentions are premised on the reduction of one of the two murder convictions from first degree to second degree, the conten-

---

[14]This contention might be rejected on the alternative basis that defendant's failure to make a timely and proper objection to the prosecutor's remark waived any error. (See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 756-759 [175 Cal.Rptr. 738, 631 P.2d 446].)

tions must fail as we have concluded that both first degree murder convictions must be affirmed. In any event, a special circumstance is sui generis—neither a crime, an enhancement, nor a sentencing factor. (*People v. Garcia* (1984) 36 Cal.3d 539, 552 [205 Cal.Rptr. 265, 684 P.2d 826]. See also, *Poland v. Arizona* (1986) 476 U.S. 147 [90 L.Ed.2d 123, 106 S.Ct. 1749, 1755].) Because the multiple-murder special circumstance does not define a crime separate from the qualifying murders, there is no need to impose a mental element requirement. The statutory language plainly requires no particular mental state and, indeed, is addressed to circumstances at the time of conviction, not at the time of the commission of the qualifying offenses.

Any doubts on this score were resolved by *People v. Hendricks* (1987) 43 Cal.3d 584, 595-596 [238 Cal.Rptr. 66, 737 P.2d 1350], construing the prior-murder-conviction special circumstance (§ 190.2, subd. (a)(2)) and rejecting an argument that "the death penalty is appropriate only when a defendant commits murder after he has been put on notice by a previous murder conviction that if he repeats the crime he might suffer the ultimate punishment." (P. 595.) *Hendricks* also held that the "order of the commission of the homicides is immaterial." (P. 596, fn. omitted.)

Although defendant attempts valiantly to distinguish *Hendricks,* his efforts are unavailing. The special circumstances for prior murder convictions and for multiple-murder convictions are closely related and must be construed harmoniously to require neither a specific mental state nor a particular order of commission of the homicides.[15]

B. *Duplication.*

 Two multiple-murder special circumstances were alleged (one as to each murder) and both were found true. Defendant maintains that one must be stricken because they refer to precisely the same circumstance.

The argument is meritorious. Under subdivision (a)(3) of section 190.2, the penalty of death may be imposed where "[t]he defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree." A defendant charged with two murders may be charged with only one multiple-murder special circumstance, which should be charged separately from the individual murder counts. (*People v. Anderson, supra,* 43 Cal.3d 1104, 1150; *People v. Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115].) The charging of two multiple-murder

---

[15] The special circumstance intent requirement under subdivision (b) of section 190.2 for aiders and abettors (see *People v. Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]) is, of course, not at issue in this case.

special circumstances in this case was error, and one of the special circumstance findings will be stricken.

C. *Reasonable Doubt Instruction.*

 Relying on Justice Mosk's concurring opinion in *People* v. *Brigham* (1979) 25 Cal.3d 283 [157 Cal.Rptr. 905, 599 P.2d 100], defendant contends that the reasonable doubt instruction, CALJIC No. 2.90 (1979 rev.) violates the Eighth Amendment prohibition against cruel and unusual punishment when used to define the standard of proof for a special circumstance because it uses archaic language and confusing terminology. Defendant suggests the jurors be instructed they must be reasonably persuaded to a near certainty of the truth of the special circumstances.

Defendant concedes that the same standard of proof—proof beyond a reasonable doubt—governs both the guilt and the special circumstance determinations and he also concedes, as established by *Brigham,* that CALJIC No. 2.90 adequately defines the standard for purposes of guilt determinations. He specifically disclaims any argument based on constitutional due process requirements, founding his argument instead on Eighth Amendment considerations. The qualitative difference between the death penalty and all other penalties has been held to require a higher degree of reliability in the determination that death is the appropriate punishment. (See *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (plur. opn.); *People* v. *Deere* (1985) 41 Cal.3d 353, 363 [222 Cal.Rptr. 13, 710 P.2d 925].) Defendant views this need for greater reliability as encompassing a need for greater clarity in the instruction defining the standard of proof and he maintains that CALJIC No. 2.90 is deficient when measured against this higher standard.

While CALJIC No. 2.90 may be subject to criticism for its anachronistic language, it has for many years provided the benchmark for defining the standard of proof required for conviction in a criminal proceeding and is undoubtedly correct if properly understood. Defendant provides no persuasive reason to reexamine our determination in *Brigham, supra,* 25 Cal.3d 283, that it provides at present the best available definition of the standard of proof beyond a reasonable doubt.

IV. PENALTY ISSUES

The prosecution rested at the penalty phase upon the evidence presented at the guilt and special circumstance phase. Defendant then stated: "Your Honor, I can't mitigate circumstances of a crime I didn't commit, so I am going to waive any argument I am entitled to." The prosecutor made a brief

argument after which the court inquired whether defendant wished "to be heard in argument." Defendant replied: "No, I don't. I have nothing to say. I can't mitigate the circumstances of something I didn't do." The jury was instructed and retired, returning a verdict of death after less than four hours of deliberations.

 As hereafter explained, the crucial jury instructions defining the process to be employed in determining defendant's penalty were potentially misleading. The prosecutor's argument exploited the potential ambiguities in the instructions and may have diverted the jury from a correct understanding of the weighing process by which the appropriate penalty is to be determined and from a correct understanding of its responsibility to consider all relevant mitigating evidence. The jury did not have the benefit of any defense argument, which might have restored a correct understanding of the penalty determination process. In addition, as earlier held, it was error to charge and to permit the return of verdicts on more than one multiple-murder special circumstance. Because the jury may have been misled as to the process for determination of penalty, the submission of more than one multiple-murder special circumstance could have caused the jury to give undue consideration to this aspect of the case. No meaningful penalty trial occurred, and in view of the fact that the prosecution's case for imposition of the death penalty was not overwhelming, it must be concluded that the judgment must be reversed as to penalty.

A. *Instructions on Mitigating Evidence and Penalty Determination.*

 Section 190.3 provides that "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." We have acknowledged that an instruction using this statutory language, and in particular the words "shall impose a sentence of death if . . . the aggravating circumstances outweigh the mitigating circumstances," is potentially misleading if given without elaboration. (*People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

One danger is that a jury instructed in the statutory language will misapprehend the nature of the weighing process, which connotes a qualitative evaluation. The process is not performed in a mechanical fashion by comparing the number of factors in aggravation with the number in mitigation, or by the arbitrary assignment of weights to the factors. (See *People* v. *Allen, supra,* 42 Cal.3d 1222, 1277.) As we have emphasized, the sentencing func-

tion is inherently moral and normative (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 779 [230 Cal.Rptr. 667, 726 P.2d 113]) and therefore the weight or importance to be assigned to any particular factor or item of evidence involves a moral judgment to be made by each juror individually.

A second danger is that the jurors will fail to understand that in evaluating the separate factors they must make a reasoned and individualized judgment on the appropriate penalty. ▉ Our statutory scheme does not require any juror to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances. (*People* v. *Allen, supra,* 42 Cal.3d at p. 1277; *People* v. *Brown, supra,* 40 Cal.3d at p. 541.) The weighing process must be understood as the method by which the jury chooses between two exceedingly severe penalties, life imprisonment without parole and death. "It follows that the weighing of aggravating and mitigating circumstances must occur within the context of *those two punishments*; the balance is not between good and bad but between life and death." (*People* v. *Brown, supra,* at p. 542, fn. 13, original italics.)

▉ Here the jury was instructed in the language of former CALJIC No. 8.84.2: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole." The jury was also instructed in the language of former CALJIC No. 8.84.1(k) which failed to include the statements prescribed in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813], to insure that the penalty jury understands its responsibility to consider any mitigating aspects of defendant's character or record. (See *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954].) ▉ As in all cases where these potentially misleading instructions have been given, we examine the entire record, focusing particularly on the arguments of counsel and any other relevant instructions, to determine whether the jury may have been misled regarding the scope of its sentencing discretion and its responsibility to consider all of the mitigating evidence in the case. (*People* v. *Melton* (1988) 44 Cal.3d 713, 761 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Hendricks* (1988) 44 Cal.3d 635, 650-651 [244 Cal.Rptr. 181, 749 P.2d 836]; *People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

▉ In this case the court gave no other instructions which served to clarify the nature of the weighing process, the scope of the jury's sentencing discretion, or its obligation to consider all mitigating evidence. Employing our case-by-case analysis of the arguments, under these circumstances it

must be concluded that the prosecutor's argument exacerbated the ambiguity in the instructions in two important ways.

First, the prosecutor portrayed the weighing process as being essentially an inquiry into whether the capital offenses were in any way justified or excused rather than a process for determining, by the consideration of statutory aggravating factors and all relevant mitigating circumstances, which of two severe penalties was more appropriate. The prosecutor stated that "the most important factor to be considered is the circumstances of this particular crime itself," and that the jury was required to determine "whether or not there was any justification for Mr. Crandell's conduct." The prosecutor then argued that there was no "legal or moral or practical or any type of justification for Mr. Crandell's conduct."

Because defendant offered no evidence of moral justification and did not rely in argument on the factor of moral justification (§ 190.3, factor (f)), this factor was irrelevant to penalty determination. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 289 [221 Cal.Rptr. 794, 710 P.2d 861].) As we have noted, it would be "rare indeed" to find mitigating evidence in a capital case which could justify or excuse the defendant's conduct. (*People* v. *Brown, supra,* 40 Cal.3d at p. 542, fn. 13.)

▇▇▇ Argument stating that particular mitigating factors have not been proven is, of course, entirely appropriate. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 789-790.) ▇▇▇ Here, however, the prosecutor failed to discuss any other aggravating or mitigating factors apart from the circumstances of the crime itself, and he incorrectly implied that the absence of the moral justification factor itself warranted imposition of the death penalty. Finally, and most importantly, this argument occurred in the context of the potentially misleading instructions noted above. For these reasons, the prosecutor's argument could have caused the jury to form a distorted perception of the weighing process by which penalty is determined.

Second, the prosecutor failed to acknowledge the existence of mitigating circumstances and strongly implied there were none. At the penalty phase the prosecutor introduced no evidence of prior criminal activity by the defendant involving violence and no evidence of any prior felony conviction. (See § 190.3, factors (b) & (c).) The absence of prior violent criminal activity and the absence of prior felony convictions are significant mitigating circumstances in a capital case, where the accused frequently has an extensive criminal past. (See *People* v. *Brown, supra,* 40 Cal.3d at p. 542, fn. 13 ["Often a person in this situation will have a substantial history of criminal and antisocial behavior"].) Without mentioning these mitigating factors, the prosecutor remarked: "The defendant has stated just moments

ago he can offer nothing in mitigation of his defense." Viewed in context with the prosecutor's focus on the circumstances of the capital offenses and his focus on the absence of justification, this comment implied that a death verdict was virtually compelled by the absence of any mitigating factors and in particular the absence of the one factor—i.e., moral justification—which could have provided a basis for a sentence less than death.

The prosecutor's exploitation of the instructions' ambiguities might well have been cured by a defense argument which directed the jury's attention to mitigating circumstances and properly explained the nature of the weighing process as the jury's individualized normative determination that one of the two severe penalty alternatives is the more appropriate. In the absence of any argument on defendant's behalf, however, it cannot be said with confidence that the jury received a correct understanding of the scope of its sentencing discretion and of its duty to consider all relevant mitigating evidence.

B. *Duplicative Special Circumstances.*

As previously explained, it was error to charge defendant with two multiple-murder special circumstances and to permit the jury to make findings on each charge. Permitting the jury "to consider those findings as two aggravating factors at the penalty phase" was also error. (*People* v. *Kimble* (1988) 44 Cal.3d 480, 504 [244 Cal.Rptr. 148, 749 P.2d 803].)

The risk that the jury will consider each multiple-murder special circumstance charged and found true as a separate factor in aggravation, thus "double counting" what should be treated as a single circumstance in aggravation, is ordinarily not great because the jury is well aware of the actual number of murders. (See *People* v. *Ruiz* (1988) 44 Cal.3d 589, 620 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Kimble, supra,* 44 Cal.3d at p. 504; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1281; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 788.) In combination with instructions and argument tending to mislead the jury as to the process by which the penalty determination is to be made, however, submitting more than one multiple-murder special circumstance for the jury's consideration at the penalty phase might have a greater impact than it otherwise would. As noted above, this is just such a case and we are unable to conclude with confidence that the error did not affect the penalty verdict.

C. *Conclusion.*

Although the guilt phase crimes were abhorrent and warranted a severe sentence, the prosecution's case for imposition of the most extreme sen-

tence—the death penalty—was not overwhelming. There was only one special circumstance, there was no evidence of any prior criminal conduct whatsoever, the guilt phase crimes arguably were an isolated and aberrant incident, and defendant's moral culpability may possibly have been diminished to some extent by excessive consumption of alcohol. Although no evidence, either mitigating or aggravating, was received at the penalty phase, the jury had before it evidence received during the guilt trial which related to defendant's character and background and which had potentially mitigating aspects. This evidence included Marie's testimony that defendant was employed, that he bought groceries and other household supplies for the P. family while he lived with them (sometimes pawning his own possessions to obtain funds for this purpose), and that he seemed concerned, after the murders, to prevent Marie's seven-year-old sister Kathy from seeing the bodies of her father and brother.

As stated above, the jury instructions were potentially misleading as to the nature of the weighing process and the jury's responsibility to consider all relevant mitigating evidence and these instructional ambiguities were exploited to defendant's prejudice by the prosecutor's argument and were not resolved by defense argument. The jury may have improperly considered the two multiple-murder special circumstances as two aggravating factors. Inasmuch as the prosecution's case for the death penalty was not overwhelming and there was some mitigating evidence, the unusually truncated penalty proceeding and the absence of defense argument could only exacerbate these problems. I therefore conclude the penalty judgment may not stand.

## V. DISPOSITION

The judgment of guilt and one multiple-murder special-circumstance finding are affirmed. The other multiple-murder special-circumstance finding is stricken, the death sentence is reversed, and the case is remanded for a new penalty trial.

**LUCAS, C. J.,** Concurring and Dissenting.—I concur in the judgment to the extent it would affirm the guilt judgment and special circumstance finding. I respectfully dissent, however, to the reversal of penalty on the grounds specified by the lead opinion. In my view, we have *affirmed* penalty judgments in cases involving prosecutorial argument far more questionable than was involved here.

Defendant, acting in pro. per., introduced no evidence at the penalty phase and made no penalty argument. (As he stated, "I can't mitigate the circumstances of something I didn't do.") The prosecutor, likewise declin-

ing to present any penalty phase evidence, gave a brief argument (comprising only two pages of transcript) which basically emphasized the circumstances of the offenses, and the lack of any legal or moral justification for them. (No suggestion whatever was made that the absence of such justification was an affirmative aggravating circumstance.) The prosecutor referred to the fact that defendant had asserted no mitigating evidence, but instead of urging a death sentence he simply left the "difficult choice" of the "appropriate" penalty decision to the jury. A milder prosecutorial argument would be difficult to find.

The lead opinion would reverse penalty because of (1) the giving of the standard, unadorned jury instructions (directing the jury to impose death if aggravating factors outweigh mitigating ones), (2) the absence of any defense argument, (3) the prosecutor's supposedly misleading remarks, and (4) the charging of two multiple-murder special circumstances where only one was involved (there were only two victims).

The critical ground would appear to be the prosecutor's remarks, for we have never suggested that reversal of a penalty judgment could be founded on the other enumerated grounds in the absence of misleading prosecutorial argument. Yet I fail to see anything improper about the brief argument presented here—the prosecutor merely stressed the importance of two of the various sentencing factors, the circumstances of the offense, and defendant's lack of legal or moral justification for the offense.

Indeed, the prosecutor's concluding remarks were unusually *favorable* to the defendant, for the prosecutor declined to take a position on the matter of penalty. Surely the prosecutor was not expected to go further, assume the role of defense counsel and make arguments regarding possibly applicable *mitigating* circumstances. Yet the lead opinion appears to require precisely that, for it stresses that the prosecutor "failed to acknowledge the existence of mitigating circumstances and strongly implied there were none." (*Ante,* p. 884.) Again, in my view, a prosecutor must be given broad leeway to characterize the evidence as he deems appropriate. He certainly cannot be expected to make defendant's arguments for him.

The lead opinion characterizes the prosecutor's brief, innocent remarks as "an inquiry into whether the capital offenses were in any way justified or excused," rather than a determination of the appropriate penalty. (*Ante,* p. 884.) I fail to see how the prosecutor's emphasis on the crime, and the lack of justification for its commission, was in any way improper. Prosecutors frequently and properly stress the fact that the offenses were heinous, brutal and lacking in any moral or legal justification.

For the foregoing reasons, I cannot agree with the lead opinion's reversal of penalty.

Panelli, J., and Eagleson, J., concurred.

**ARGUELLES, J.,** Concurring and Dissenting.— ■ ■ I agree with the lead opinion that, as a result of the conducted *Marsden* and *Faretta* hearings (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]; *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]), defendant was not denied his constitutional right to counsel and that his waiver of appointed counsel was voluntary. Consequently, the trial court did not err in permitting defendant to represent himself.

As the lead opinion recognizes, however, it is clear under *People* v. *Bigelow* (1984) 37 Cal.3d 731, 743 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], that the trial court erred when it denied defendant's motion for the appointment of advisory counsel on the mistaken premise that it had no discretion to make such an appointment. Unlike that opinion, I do not believe that we can properly discount the trial court's failure to exercise discretion on the theory that the court would not have abused its discretion had it denied the advisory counsel motion. This is a capital case in which the aid of a knowledgeable legal advisor is of paramount importance. Although defendant had apparently done a creditable job in representing himself at the preliminary examination, the record is clear he continually felt he needed legal assistance at trial. Given the gravity of the consequences which defendant faced and the complexity of death penalty provisions and procedures, I cannot find either that the trial court would have denied the motion for advisory counsel if it had recognized that it had the discretion to make such an appointment or that the court could properly have refused such an appointment in these circumstances.

Although I thus conclude that the trial court erred in failing to appoint advisory counsel in this case, I would not embrace the broad statement in the majority opinion in *Bigelow, supra,* 37 Cal.3d at pp. 744-746, that an erroneous denial of advisory counsel necessarily requires reversal in every case regardless of the circumstances, i.e., is subject to a rule of per se reversal. That statement was not necessary to the decision in *Bigelow,* because on the facts of that case the defendant was quite clearly prejudiced by the court's failure to appoint advisory counsel. Instead, I would follow the views expressed by Justice Kaus in his separate opinion in *Bigelow, supra,* 37 Cal.3d at p. 756, and would leave open the possibility that in an appropriate case such an error may be found nonprejudicial.

On the particular facts of this case, however, the failure to appoint advisory counsel must be found prejudicial, with respect to both the

guilt/special circumstance phase and the penalty phase. Although there was sufficient evidence to support the jury's guilt and special circumstance verdicts, there was also considerable evidence indicating that both the defendant and one of the victims had been drinking heavily on the night of the killings and also some evidence suggestive of heated quarreling and self defense. Given such evidence, I cannot share the lead opinion's confidence that the absence of advisory counsel did not affect the guilt or special circumstance verdicts actually rendered. Furthermore, because it is unclear from the record that defendant recognized how to conduct a penalty phase defense and no such defense was presented, the absence of advisory counsel at that stage was patently prejudicial.

Accordingly, while I agree with the lead opinion's result with respect to the penalty judgment, I dissent from the affirmance of the guilt judgment and the special circumstance finding.

**BROUSSARD, J.** Dissenting.—I dissent from the affirmance of defendant's conviction. My analysis of the proceedings below leads me to the conclusion that the lower courts deprived defendant of his fundamental constitutional right to the assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I., § 15.) Denial of the right to counsel is prejudicial per se and requires reversal of the judgment. (*Holloway* v. *Arkansas* (1978) 435 U.S. 475, 489 [55 L.Ed.2d 426, 437-438, 98 S.Ct. 1173]; *People* v. *Bigelow* (1984) 37 Cal.3d 731, 744 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723].)

The record reveals that defendant had lost all faith in his appointed counsel, but clearly desired the assistance of counsel. The lower courts[1] stubbornly rejected his many efforts to secure such assistance, despite the significant interests at stake and the options available to protect those interests. Indeed, the courts appeared to be more solicitous of the policies of the public defender's office than they were of defendant's constitutional right to the assistance of competent counsel and the state's independent interest in the reliability and fairness of capital trials. (*People* v. *Deere* (1985) 41 Cal.3d 353, 363 [222 Cal.Rptr. 13, 710 P.2d 925].) The effect of the rulings by the lower courts was to force an untrained layperson to defend his life in a complex trial. Despite his admirable efforts, defendant's performance pre-

---

[1] Throughout this opinion, I will refer to the conduct and rulings of both the municipal and superior courts in order to present a complete picture of the underlying proceedings and to demonstrate the totality of the institutional intransigence faced by this defendant. In my view, both courts contributed to the overall injustice. Because the errors that occurred during the superior court proceedings provide sufficient grounds upon which to reverse the conviction, it is unnecessary to decide whether the rule in *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941] would preclude us from finding that error occurred in the municipal court proceedings.

dictably reflected his inexperience and lack of training. Had he been represented by counsel in the same fashion as that in which he represented himself, a strong case could be made for ineffective assistance of counsel. Because it is impossible to know how the evidence might have been developed and presented had defendant received the assistance of competent counsel, this court should have no confidence in the reliability of either the guilty verdict or the judgment of death. To affirm defendant's conviction under these circumstances is a travesty of justice which our legal system should not tolerate.

## I. Procedural Background

Defendant began to lose faith in his appointed counsel, Deputy Public Defender Samuel Gordon, when the latter failed to communicate with him or to answer letters or phone calls for two months. Defendant began filing motions on his own behalf in municipal court because he believed Mr. Gordon had abandoned him.[2]

About three months after Mr. Gordon had been appointed, defendant sought to "waive" his counsel on the ground that Mr. Gordon had "done nothing" on the case and had refused to communicate with him. The municipal court judge scheduled a hearing and ordered Mr. Gordon to attend. When defendant repeated his complaints, the judge noted Mr. Gordon's reputation and experience. He then called a recess to enable attorney and client to confer. According to defendant, during the recess, Mr. Gordon admitted having done nothing on the case and "blew up" at him. Upon their return to the courtroom, defendant again repeated his complaints and "waived" the public defender as his counsel. The judge sought no further information about Mr. Gordon's performance or the state of the attorney-client relationship. Instead, he informed defendant that the court had no power to appoint anyone but the public defender.[3] After warning defendant that he would be given no special treatment, the judge found that defendant had knowingly waived his right to counsel.

Defendant subsequently requested that cocounsel be appointed to assist him in his defense. The municipal court reiterated its position that it could only appoint the public defender and denied the motion. Later, defendant renewed his motion for cocounsel and added a request for the appointment

---

[2] Apparently through some clerical error, defendant was placed in the pro. per. section of the jail shortly after his arraignment. As a result of this transfer and Mr. Gordon's failure to respond to defendant's attempts to contact him, defendant assumed that he no longer had an attorney.

[3] Mr. Gordon, apparently in support of the judge's comments, pointed out on the record that there was no conflict of interest and that the court "has no power nor the funds to appoint counsel at defendant's whim."

of advisory counsel. The same judge denied both motions on the ground that "we have no county funds to pay for that."

Before beginning the preliminary hearing, defendant again raised the issue of cocounsel or advisory counsel. The magistrate informed defendant that his only choices were to employ a private attorney or to accept the public defender. The magistrate then called a recess to permit defendant to speak to Deputy Public Defender Winckler who was present in the courtroom. After talking to defendant, Mr. Winckler asked that the record reflect that defendant asked for the assistance of counsel, but that the public defender's office had a policy against acting as advisory counsel. Unable to obtain the assistance of counsel other than Mr. Gordon, whom he mistrusted, defendant represented himself at his preliminary hearing, and was held to answer on the charges contained in the complaint.

In superior court, defendant filed a motion to set aside the information pursuant to Penal Code section 995 on the ground that his motions for the appointment of cocounsel or advisory counsel to assist him in the municipal court proceedings were erroneously denied. His motion was denied by Judge Arabian on the ground it had been within the prerogative of the municipal court to deny defendant's earlier requests.

Defendant continued to seek the appointment of counsel at his first appearance in the superior court. He moved to have Mr. Kanarek, a private attorney who was present at the hearing, appointed to represent him. Judge Kolostian responded, "[t]he lawyer I appoint is the Public Defender, and the Public Defender that was assigned to the case is Mr. Sam Gordon. . . You have not the right to pick and choose between what Public Defender is going to represent you." When defendant stated that he had a conflict of interest[4] with Mr. Gordon, the court replied that it was simply a "personality conflict" and "I can't appoint anybody but the Public Defender." Mr. Kanarek then requested that the court conduct an evidentiary proceeding concerning the representation provided by Mr. Gordon, and that he be permitted to represent defendant in the hearing. Judge Kolostian replied, "I said I will appoint a lawyer, but that lawyer will be the lawyer for the whole trial. If there is no conflict, that lawyer will be his lawyer and he will have to pay for it or you will do it for free, one or the other." The district attorney also opposed the appointment of anyone other than the public defender's office. He pointed out that defendant only complained about Mr. Gordon and "that does not eliminate the rest of the Public Defender's office." He

---

[4] At times, defendant referred to his problem with Mr. Gordon as a "conflict of interest." However, given the substance of his complaints, it is clear that he did not use that term as it is understood in the legal community. The essence of his claim was that Mr. Gordon failed to provide him with effective representation.

added that defendant would accept advisory counsel, to which the judge replied, "No, there is no such thing."

Judge Kolostian ultimately scheduled an evidentiary hearing, but he did not permit Mr. Kanarek to attend. Defendant repeated his complaints about Mr. Gordon and stated that he had "no faith or confidence in him." The judge characterized the problem as a "personality conflict" and accepted Mr. Gordon's representation that there was no conflict of interest. The district attorney suggested that "an inquiry of cause must be made of the defendant's reasons in detail." He noted that defendant had alleged that Mr. Gordon recommended that he plead guilty and had failed to communicate with defendant for some two months. When the judge replied that "we have to be very careful not to go into confidentiality of communications," the district attorney suggested that the inquiry be made outside of his presence. The judge expressed doubt about the obligation of the attorney to explain his conduct. He then asked a few perfunctory questions of Mr. Gordon, who assured the court that he did not recommend a plea and that he was "prepared to try the preliminary hearing the morning the defendant asked to go pro. per." The court replied, "Okay, that is good enough for me. Lawyer is prepared to go to trial on the matter. . . ."

The matter was continued until the following day at which point defendant once again challenged the policy of the public defender's office not to act as advisory counsel. The court replied, "I wouldn't appoint that kind of counsel anyway." The court explained again that the only time private counsel would be appointed is when the public defender's office had a conflict—"either they are representing [ ] somebody else, like a co-defendant or a witness or somebody." The judge reiterated that he found no conflict of interest.

The judge then warned defendant of the hazards of representing himself, stating, "I am well aware of how smart you are and how good [sic] you are handling your case, so you are not the typical illiterate defendant. You are very smart and notwithstanding that, there are a lot of legal things you do not know." The judge explained the ground rules: the district attorney was experienced; the proceeding would be adversarial; defendant risked making serious errors; the court had to remain neutral and could not assist him; and his incompetence would not form the basis of reversal on appeal. Defendant responded that he understood. The judge stated, "I think it is dumb what you are doing, but my opinion is immaterial." He then found that defendant had validly waived his right to counsel.

For reasons that do not appear in the record, the court conducted a second hearing in camera outside of the presence of the district attorney.

Defendant assured the court that his lack of confidence in Mr. Gordon did not stem from a personality conflict. He reiterated his complaints that counsel had recommended that he plead guilty without having investigated the case; had failed to respond to his communications; and had admitted having done nothing on the case. In response to the court's questions, Mr. Gordon stated that he had prepared for the preliminary hearing, that he did not recommend that defendant plead guilty, that he had discussed diminished capacity and other defenses with defendant and that there had been a tactical disagreement concerning the defense.

Defendant's case was assigned to Judge Arabian for trial. The judge asked whether there was any need for him to further admonish defendant about the hazards of self-representation. Defendant replied that there was no additional need and that he had tried unsuccessfully for over a year to obtain appointed counsel. When the judge asked if he intended to exercise his right to represent himself, defendant replied, "Yes. I have no alternative." Defendant continued to represent himself throughout his capital trial.

## II. SUBSTITUTION OF COUNSEL

The fundamental right to counsel includes the right to effective assistance of counsel. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 692, 104 S.Ct. 2052]; *People* v. *McKenzie* (1983) 34 Cal.3d 616, 626 [194 Cal.Rptr. 462, 668 P.2d 769].) Courts require that defense counsel meet the standard of representation expected of a "reasonably competent attorney acting as a diligent, conscientious advocate." (*People* v. *Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Effective assistance of counsel also contemplates a relationship of trust and cooperation between attorney and client, particularly when the attorney is defending the client's liberty. (*Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 561 [68 Cal.Rptr. 1, 440 P.2d 65]; *People* v. *Munoz* (1974) 41 Cal.App.3d 62, 66 [115 Cal.Rptr. 726].) Thus, it is a denial of the right to effective assistance of counsel " 'to compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict.' " (*People* v. *Stankewicz* (1982) 32 Cal.3d 80, 94 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476], quoting from *Brown* v. *Craven* (9th Cir. 1970) 424 F.2d 1166, 1170.)

When a defendant raises the issue of incompetency of his appointed counsel, the trial court must give him an opportunity to explain the basis of his claim. (*People* v. *Marsden* (1970) 2 Cal.3d 118, 126 [84 Cal.Rptr. 156, 465 P.2d 44].) If defendant articulates facts which suggest that counsel is rendering constitutionally ineffective assistance, the trial court has a duty to make whatever inquiry is necessary to develop a record sufficient to assess

the claim (*People* v. *Munoz, supra,* 41 Cal.App.3d at p. 66, cited with approval in *People* v. *Lewis* (1978) 20 Cal.3d 496, 499 [143 Cal.Rptr. 138, 573 P.2d 40].)[5] Depending on the nature of defendant's grievances, it may be necessary for the court to question his attorney. (*People* v. *Hill, supra,* 148 Cal.App.3d 744, 753.)

Judge Kolostian apparently attempted to adhere to this requirement by conducting the pretrial evidentiary hearings in superior court. However, the court's inquiry was so perfunctory as to be "lacking in all the attributes of a judicial determination." (*People* v. *Munoz, supra,* 41 Cal.App.3d at p. 66, citations omitted.) Moreover, the court failed to inquire into the state of the attorney-client relationship. As such, the hearing did not serve the interests protected by *Marsden, supra,* 2 Cal.3d 118.

The record of the evidentiary hearings leaves several significant questions unanswered. Although Mr. Gordon claims to have been prepared to try the preliminary hearing, it is not clear what he had done to prepare. There is no indication that he had investigated any of the possible defenses he claimed to have discussed with defendant. Although counsel maintains he met with defendant on three occasions, there is no indication when the meetings occurred, how long they lasted, or what specifically was discussed.[6] Although he acknowledged his failure to communicate with defendant for two months between the arraignment and the preliminary hearing, Mr. Gordon did not provide any explanation for his conduct. One cannot ascertain from the record whether counsel received the letters sent by his client or messages of his phone calls or whether he was otherwise aware that his client was attempting to reach him. Moreover, there is no indication that Mr. Gordon made any attempt to reassure defendant or to repair defendant's loss of faith in him.

The majority conclude that the record does not demonstrate that counsel failed to provide effective assistance. They maintain that lack of communi-

[5] See also *People* v. *Groce* (1971) 18 Cal.App.3d 292, 296 [95 Cal.Rptr. 688], review denied Sept. 2, 1971; *People* v. *Miller* (1973) 33 Cal.App.3d 1005, 1021 [109 Cal.Rptr. 648]; *People* v. *Molina* (1977) 74 Cal.App.3d 544, 548 [141 Cal.Rptr. 533]; *People* v. *Cruz* (1978) 83 Cal.App.3d 308, 316 [147 Cal.Rptr. 740]; *People* v. *Penrod* (1980) 112 Cal.App.3d 738, 747-748 [169 Cal.Rptr. 533]; *People* v. *Hill* (1983) 148 Cal.App.3d 744, 753 [196 Cal.Rptr. 382], cited with approval in *People* v. *Hamilton* (1985) 41 Cal.3d 408, 421 [221 Cal.Rptr. 902, 710 P.2d 981]; *People* v. *McElrath* (1985) 175 Cal.App.3d 178, 184 [220 Cal.Rptr. 698]; *People* v. *Brown* (1986) 179 Cal.App.3d 207, 216 [224 Cal.Rptr. 476]; contra, *People* v. *Jacobs* (1972) 27 Cal.App.3d 246, 261 [103 Cal.Rptr. 536]; *People* v. *Huffman* (1977) 71 Cal.App.3d 63, 80 [139 Cal.Rptr. 264]; *People* v. *Terrill* (1979) 98 Cal.App.3d 291, 299-301 [159 Cal Rptr. 360].)

[6] Although the court may have been legitimately concerned about disclosure of confidential communications in the presence of the district attorney, the subsequent in camera hearing provided an opportunity to inquire into the specific interactions between client and counsel pertinent to defendant's complaints.

cation for two months is not enough to establish ineffective assistance, and that the court could properly rely on counsel's representation that he was prepared to try the preliminary hearing. I submit that the court could not properly determine the import of counsel's alleged failure to communicate with his client without knowing the circumstances behind the lapse in communication. If counsel were permitted to rebut a claim that he was unprepared merely by assuring the court that he was in fact prepared, the proceedings mandated by *Marsden, supra,* 2 Cal.3d 118, amount to little more than a meaningless ritual.

The majority also apparently adopt counsel's characterization of the conflict between him and defendant as a "tactical" one. While tactical conflicts do not necessarily require the substitution of attorneys, they can be serious enough to "signal a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." (*People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710]; see also *People* v. *Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Drumgo* (1973) 8 Cal.3d 930, 935 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984].)

The majority find that the court reasonably concluded that defendant had not demonstrated a complete breakdown of the attorney-client relationship given the early stage of the proceeding at which Gordon's representation of defendant terminated. In ruling on a claim of inadequate representation, courts often consider whether the claim was made too *late* in the proceedings. (*Brown* v. *Craven, supra,* 424 F.2d 1166, 1169-1170; *United States* v. *Michelson* (9th Cir. 1977) 559 F.2d 567, 571-572; *United States* v. *McClendon* (9th Cir. 1986) 782 F.2d 785, 789.) The majority turn this factor on its head by approving denial of a claim made too *early* in the proceedings.

Moreover, the scarcity of evidence in the record concerning whether the attorney-client relationship had broken down by the time Gordon was discharged is not as much a function of the early stage of the proceedings as it is the municipal court's failure to conduct a *Marsden* inquiry (*supra,* 2 Cal.3d 118).[7] Defendant fairly raised the issue and should not be penalized for the court's failure to properly respond.

---

[7] Contrary to the majority, I find that defendant's requests in municipal court were sufficient to trigger the trial court's duty to conduct a *Marsden* inquiry. On more than one occasion, defendant alleged that his counsel had provided inadequate assistance. The court merely assured him Mr. Gordon was a good lawyer and discouraged him from representing himself. When defendant then requested the appointment of cocounsel, the court told him that it only had authority to appoint the public defender. Defendant could have reasonably assumed that the court would not have appointed any attorney other than Mr. Gordon, and that it would have been futile to request the substitution of counsel; the court had already effectively denied the request. Moreover, "[t]he semantics employed by a lay person in assert-

Despite the municipal court's failure to develop an adequate record, there is no indication that insufficient time had elapsed for counsel and client to develop irreconcilable differences. According to Mr. Gordon, he had met with defendant on three occasions. Although the record does not disclose what transpired at those meetings, both counsel and defendant indicate that they disagreed on how to conduct the defense. Defendant alleges he made numerous attempts to reach his attorney, all of which were unsuccessful. Defendant further reports that he and Mr. Gordon had a serious altercation during the recess at the hearing in municipal court. Most significant is that defendant was desperate for the assistance of counsel, yet he persistently rejected representation by Mr. Gordon. Ultimately, defendant was willing to risk his life rather than to entrust Mr. Gordon with its protection. One cannot escape the clear implication that the relationship between defendant and his appointed attorney had irreparably deteriorated.

The superior court failed to carefully investigate the merits of defendant's claim that his counsel provided inadequate assistance. This failure led to its erroneous denial of his claim, which in turn led to defendant's invalid waiver of his constitutional right to the assistance of counsel.

### III. WAIVER OF RIGHT TO COUNSEL

The Sixth Amendment of the United States Constitution affords criminal defendants the right to elect self-representation rather than representation by counsel. (*Faretta* v. *California* (1974) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]) A defendant's choice to represent himself necessarily entails a waiver of the right to counsel. In order to assure that such a waiver is knowingly and intelligently made, defendant must be "made aware of the dangers and disadvantages of self-representation." (*Id*. at p. 835 [45 L.Ed.2d at p. 582].)

Defendant does not dispute that the court, on more than one occasion, cautioned him against undertaking his own representation. Nor does he contest his capacity to waive his right to the assistance of counsel. Rather, he claims that his choice to represent himself was not voluntary, but was effectively coerced by the court's insistence that his only other alternative was to accept representation by Mr. Gordon.

The Court of Appeal was faced with a similar situation in *People* v. *Cruz, supra,* 83 Cal.App.3d 308. That court noted ". . . the record that is before

---

ing a constitutional right should not be given undue weight in determining the protection to be accorded that right." (*People* v. *Marsden, supra,* 2 Cal.3d at p. 124.) Defendant made it clear that he considered his appointed attorney to be ineffective and that he wanted the assistance of some other attorney. This is tantamount to a request for the appointment of substitute counsel.

us clearly indicates that defendant's decision to go pro. per. was not based on trial tactics that he could better persuade the jury, but was based on a lack of viable alternatives. The trial court's failure to inquire precluded the possibility of a substitution of counsel. Defendant was left with the choice between counsel who he mistrusted or proceeding in pro. per. . . . Defendant, perceiving the alternatives as imposed and as limited by the court, chose self-representation.

"The knowing and intelligent waiver of counsel envisions the election between viable alternatives. Defendant's decision to proceed in pro. per. was predicated upon his belief, mistaken or not, that he could not expect effective representation from the public defender's office. This belief was effectively reinforced by the court's failure to fully explore defendant's charges. Under the circumstances, defendant cannot be said to have been fully apprised of his right to counsel and therefore did not effectively waive that right. [Citations]." (*Id.* at p. 318; see also *United States* v. *Williams* (9th Cir. 1979) 594 F.2d 1258, 1259-1261; 2 LaFave & Israel, Criminal Procedure (1984) § 11.4 (d), pp. 41-42.) The same reasoning is applicable here.

Defendant was erroneously forced to represent himself in his capital trial and was denied his constitutional right to the assistance of counsel. The error was prejudicial per se. (*Holloway* v. *Arkansas, supra,* 435 U.S. 475, 489 [55 L.Ed.2d at pp. 437-438]; *People* v. *Bigelow* (1984) 37 Cal.3d 731, 744 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723].)

## IV. ADVISORY COUNSEL

The majority concede that the lower court erred by failing to exercise its discretion on defendant's several requests for the appointment of advisory counsel. The majority also acknowledge that such failure requires automatic reversal of the conviction in cases in which a refusal to grant the request would have been an abuse of discretion. (*People* v. *Bigelow, supra,* 37 Cal.3d at p. 744.) However, they find that the court's denial of defendant's request in this case would not have been an abuse of discretion, and that the court's failure to exercise its discretion was harmless. I disagree on both points. Had the court thoughtfully considered defendant's request and denied it, I would find that ruling an abuse of discretion and reverse the conviction under the per se rule in *Bigelow.* Furthermore, we can only speculate how the advice of counsel would have changed the content and result of defendant's trial. That he performed well given his lack of training says nothing about how he would have performed with the assistance of advisory counsel; nor does it assist in predicting whether the jury would have returned a verdict more favorable to him.

This case presents circumstances very similar to those presented in *Bigelow*, in which we held that it would have been an abuse of discretion for the trial court to deny defendant's request for the appointment of advisory counsel. (37 Cal.3d 731.) Most notably, both defendants faced capital charges. In *Bigelow*, we observed that capital cases "raise complex additional legal and factual issues beyond those raised in an ordinary felony trial." (*Id*. at p. 743.) Moreover, because life is at stake, courts must be particularly vigilant in capital cases to observe every precaution designed to ensure that the defendant receives a fair trial. (*Id*. at fn. 7, citing *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108].) In addition to the interests of the defendant, the state has an independent interest in the fairness and accuracy of capital trials. (*People* v. *Deere* (1985) 41 Cal.3d 353, 363 [222 Cal.Rptr. 13, 710 P.2d 925].)

The defendant in *Bigelow* was an untrained layman who was unfamiliar with the law. The trial court was initially reluctant to permit him to represent himself because he "just [didn't] know enough about the law." The court subsequently realized that Bigelow's ignorance of the law did not render him incompetent to waive counsel, but its "initial conclusion that he was not competent to defend a capital case is unquestionably true." (*Bigelow, supra,* 37 Cal.3d at p. 744.)

The majority distinguish this case from *Bigelow* by observing that "defendant appeared before the superior court as an obviously intelligent, literate, and articulate advocate in his own cause who had acquitted himself well at the preliminary hearing." (Majority opn., *ante,* at p. 864.) These observations, however, simply do not lead to the conclusion that defendant was competent to conduct a capital trial. Courts confine the representation of capital cases to experienced members of the criminal bar. It would be unusual, and probably error, to appoint a recent law school graduate, or even a seasoned attorney inexperienced in criminal cases. It goes without saying that an unadvised layperson—even one who is intelligent, literate and articulate—cannot be expected to present a competent defense. A standard under which a defendant is denied the assistance of advisory counsel merely because he is intelligent fails to protect the interests of the state and of the defendant in the fairness and reliability of capital trials. Judge Kolostian's impression that defendant was "not the typical illiterate defendant" does not meaningfully distinguish this case from *Bigelow, supra,* 37 Cal.3d 731, nor does it provide sufficient reason to deny defendant the assistance of advisory counsel.

The lower courts' failure to exercise discretion was particularly disturbing in this case. From the early stages of the proceeding, defendant had made it abundantly clear that he desired the assistance of counsel. For over

a year, he tried to secure such assistance. He did not stop at merely requesting the court to appoint counsel; he actually located private counsel who appeared at the *Marsden* hearing (*supra,* 2 Cal.3d 118) in superior court, ready and willing to serve as defendant's trial counsel. At various points in the proceedings, defendant acknowledged the difficulties of representing himself and reiterated his preference to proceed with the assistance of counsel. In response to defendant's requests for advisory counsel, the court consistently reiterated its ultimatum—defendant could either accept representation by the appointed deputy public defender or he could represent himself. Since the public defender had a policy against acting as advisory counsel, it was just as if, as Judge Kolostian put it, "there is no such thing." The court appeared to elevate the policies of the Los Angeles Public Defender's office above the defendant's right to a fair trial.

Unlike *Bigelow, supra,* 37 Cal.3d 731, this is not a case in which the court mistakenly believed it had no authority to appoint advisory counsel. Indeed, after defendant had represented himself throughout his entire trial, the trial court ultimately appointed private counsel to act in an advisory capacity for the limited purpose of assisting defendant in the filing of his motion for a new trial. The court summoned Mr. Gordon and had him state once again on the record that he refused to act as advisory counsel. Then the court simply invoked its authority under Penal Code section 987.2, subdivision (a) to appoint private counsel when the public defender "has properly refused to represent the person accused."

By granting defendant's motion for advisory counsel at this stage of the proceeding, the trial court appeared to acknowledge defendant's inability to competently argue the motion. It also demonstrated that the system was capable of accommodating the interests of the public defender's office as well as those of the defendant, contrary to the earlier representations of the municipal and superior courts. The failure of the lower courts to exercise this prerogative in response to defendant's earlier requests is disconcerting.

The majority conclude that the trial court's error was harmless. They support this conclusion by listing various instances in which defendant exhibited skillful advocacy during the guilt and special circumstances phases. However, they completely fail to mention the instances in which defendant clearly demonstrated his incompetence. The most egregious example occurred at the penalty phase. Defendant presented no penalty evidence, and simply stated: "Your honor, I can't mitigate circumstances of a crime I didn't commit, so I am going to waive any argument I'm entitled to."

Apparently, defendant mistakenly believed that by presenting mitigating evidence he would be forced to concede his guilt. Moreover, his comment

suggests that he understood mitigating evidence to be limited to the circumstances surrounding the commission of the charged crime. He obviously did not understand that he was constitutionally entitled to have the jury consider as mitigating evidence any aspect of his character or record that he might have proffered as a basis for a sentence less than death. (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954]; *People* v. *Easley* (1983) 34 Cal.3d 858, 876 [196 Cal.Rptr. 309, 671 P.2d 813].) Nor did he understand that the jury is entitled to act on the basis of sympathy or compassion aroused by such evidence. (*People* v. *Robertson* (1982) 33 Cal.3d 21, 58 [188 Cal.Rptr. 77, 655 P.2d 279]; *People* v. *Lanphear* (1984) 36 Cal.3d 163, 166 [203 Cal.Rptr. 122, 680 P.2d 1081].)

In *People* v. *Deere, supra,* 41 Cal.3d 353, we held that the failure of defense counsel to present any mitigating evidence in the penalty phase of a capital trial at the request of the defendant required that the penalty be set aside. We discussed the state's interest in the reliability of the penalty determination and observed that "[t]o allow a capital defendant to prevent the introduction of mitigating evidence on his behalf withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling." (*Id*. at p. 364.) Defendant's penalty jury was equally deprived of information which would have assisted it in determining the appropriate penalty.[8] "[N]ot only did defendant not have a fair penalty trial—in effect he had no penalty trial at all." (*Id*. at p. 368.)

As in *Deere, supra,* 41 Cal.3d 353, we cannot predict the exact nature of the mitigating evidence defendant might have presented had he received the advice of competent counsel. However, as the majority acknowledge, the charged crimes represented apparently isolated and aberrant behavior since there was no evidence that defendant had ever been involved in other violent or criminal conduct. Evidence received during the guilt phase suggested that defendant had demonstrated kindness and generosity to members of the victims' family. We have no way of knowing whether defendant had family members, friends, coworkers, neighbors or other persons whom he might also have called to testify on his behalf. Moreover, the aggravating evidence was not overwhelming. Multiple murder was the only special circumstance alleged. The prosecutor offered no evidence during the penalty phase and his brief argument pointed only to the circumstances of the crime in aggravation. Among capital crimes, these were not egregious mur-

---

[8]The prosecutor took advantage of defendant's naive approach to the penalty phase and enhanced the probability that the jury would feel compelled to return a death verdict. In arguing that aggravating circumstances outweighed mitigating circumstances, the prosecutor stated: "The defendant has stated just moments ago he can offer nothing in mitigation of his defense."

ders. On this record, even assuming the court's denial of the request for advisory counsel would not have been an abuse of discretion, the majority's conclusion that the court's error was harmless is wholly unsupportable.

## V. CONCLUSION

The lower courts repeatedly rebuffed defendant's efforts to secure the assistance of an attorney in whom he could lodge his trust and with whom he could cooperate in presenting his defense. The courts could have appointed another public defender or a private attorney to represent defendant or they could have appointed an attorney to act as advisory counsel. It was within the courts' authority to reasonably safeguard the interests of the defendant as well as the interest of the public in the fair and efficient administration of justice. Their failure to do so was an abrogation of duty and resulted in denial of the defendant's fundamental right to the effective assistance of counsel. (*People* v. *McKenzie, supra,* 34 Cal.3d 616, 626-627.) I would reverse the conviction.

Mosk, J., concurred.

Petitions of all parties for a rehearing were denied November 10, 1988.