Filed 10/8/13  P. v. Steele CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JACOB CHARLES STEELE,<br><br>        Defendant and Appellant. | A135606<br><br>(Humboldt County<br>Super. Ct. No. CR1001497) |

## I. INTRODUCTION

After a several-week jury trial, a Humboldt County jury convicted appellant of one count of second degree murder and one count of making criminal threats.  It also found true several special allegations regarding the second degree murder count.  Appellant appeals, contending that the trial court erred in instructing the jury with CALCRIM No. 3472, which provides that the right of self defense may not be contrived.  We find neither error nor prejudice in the giving of that instruction and hence affirm appellant's conviction.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellant, 23 years old in early 2012, was a native of Eureka who supported himself by selling drugs, and was a friend of the victim, Jerry George, who lived a few blocks away and also dealt drugs and bought cocaine from appellant.  After an argument in front of several acquaintances on the night of January 21, 2010,[1] appellant pulled out a

_____

[1] Unless otherwise stated, all further dates noted are in 2010.

1

.40 caliber gun and shot and killed George in appellant's home.  The versions of how that shooting occurred and what happened thereafter varied somewhat, and we will summarize those versions.

According to Hauna Kim, the victim's girlfriend and the mother of their child, George went over to appellant's apartment on Reasor Road in McKinleyville at about 7:30 p.m. on the evening in question, January 21.  At about 11 p.m. on that evening, George called Kim from appellant's phone, and told her he and appellant were arguing about a number of things, including how many people drove Mercedes (as George did), and asked her if she knew any other young people who did so; Kim responded in the negative.   When George had not returned to their home several hours later, Kim called appellant at around 1:30 a.m., but appellant told her George had left 30 minutes earlier, although he was allegedly drunk.  When George never appeared at their home, Kim called some of his family members and drove neighboring roads to try to find him, but could not.  Later on January 22, she filed a missing person's report with the police department.  She also called appellant several more times over the ensuing days asking him if he knew anything about George's whereabouts.

On the evening in question, appellant's cousin, Richard Steele, was at appellant's apartment when George arrived.  Also there were Shawn Hof, appellant's wife Lindsey, and a minor named Trey.  Richard Steele also recalled the debate between appellant and George about young people driving Mercedes.  He also recalled appellant asking George to leave, but the latter did not.  According to Richard Steele, George stood up and said: "You are going to have to fucking move me from here."  The two men then got face to face with appellant appearing "kind of . . . irritated" and George said to him: "What are you going to do?  Pull your fucking pistol out?"  And, according to the cousin, appellant who regularly carried a pistol on his right hip at that point in time, did so, cocked it, and then moved backward from George.  Richard Steele and appellant's wife Lindsey, left the room at that point, but the former heard a gunshot and came back into the room to find George lying on the floor "with a hole in his head."

2

Richard Steele asked what had happened, and appellant replied that George had "rushed" him. Richard Steele told him he "should have called the police [but appellant] said no. He wasn't going to lose his son." The two decided to work to "get rid of Jerry's body." They commenced to do so by getting a tarp and wrapping George's body in it. Appellant then called Hof, who had apparently also left appellant's house a few minutes before. They then put the body, wrapped in the tarp, in the trunk of appellant's car, and drove away and buried it at a location unspecified by appellant's cousin. In the process, and while driving along Highway 101, Richard Steele threw the barrel of appellant's gun out of the window of the car.

Hof also testified for the prosecution about some of the events of the night in question. He was a methamphetamine addict who worked on appellant's several cars and also apparently lived close by. On the night in question, he was working on one of appellant's cars, but was also in and out of the house and heard the debate between appellant and George about young people driving Mercedes. This debate "escalated into an argument" according to Hof, and appellant asked George "to leave several times." Appellant then "told everybody to get out" but Hof did not, and "tried to get [appellant] to calm down." That effort failed and Hof saw appellant shoot George, and then walk out behind Hof saying "I don't have to deal with that nigger no more. I killed him."

Hof went over to his girlfriend's house, but appellant kept calling him, insisting that he come back, and said if he did not Hof "could end up just like him." Hof then returned and helped bury George's body in a ditch; he also made arrangements with several other friends to clean up appellant's apartment, i.e., the bloody part of the carpet, etc.[2]

At some unspecified time later, appellant, his cousin Richard, and his father, Donny Steele, met a mutual friend named Brian Dulac at a boat landing off of an exit

---

[2] Several other witnesses—Nathaniel Willis, Kenneth Johnson, and Jan DeVore, appellant's mother in law—also testified that they had helped clean up appellant's apartment by, i.e., cutting and removing bloody carpeting and burning trash bags containing that carpeting.

3

from Highway 101. Appellant told Dulac that a "big black guy" had stolen some of his property earlier, and that when they were "drinking together" later "things got out of hand" and the "black guy rushed him and he shot him." Appellant and his family sought Dulac's advice regarding "getting rid of a body," and Dulac advised them (1) where and when at the mouth of the Eel River was the best place to dispose of a body and (2) "they were going to have to open him up so he wouldn't pop up out on the ocean and wash up on the beach."

Several days later, according to the testimony of Nathaniel Willis, he, appellant, and appellant's father transported George's body to the Eel River and put it into the water. Willis later "burned everybody's clothes" that had been worn that day.

In the same month all this occurred, the Humboldt County Sheriff's Department began an investigation into the disappearance of George. In the course of that investigation, both appellant and his cousin, Richard Steele, stated that George had left appellant's house at 10:45 p.m. on the evening in question, after he "and several friends had been drinking throughout the evening." Appellant did not tell the sheriff's investigator anything about a quarrel between them. In the course of the same investigation, appellant was interviewed by the sheriff's office, and a recording made of it and later played for the jury. In the course of that interview, appellant again said nothing about his having a quarrel with George.

A technician in the Humboldt County Sheriff's office then went to appellant's Reasor Road apartment and examined various devices there, as well as some of his vehicles. She found blood stains on both a carpet cleaner and a vacuum cleaner as well as on a speaker cover. The bed of appellant's truck and a bloody spare tire cover were taken into evidence. The same technician obtained two toothbrushes in order to secure the DNA of George, and also got a sample of the DNA of his sister, April George. A senior criminologist for the Department of Justice's office in Eureka testified that the DNA obtained from several of the Reasor Road sources matched the DNA of the victim, Jerry George, i.e., the DNA obtained from his toothbrushes.

4

Apparently, Shawn Hof began cooperating with the investigators because, in early August 2010, he took an investigator from the Humboldt County District Attorney's office to a location in McKinleyville, where George's body had first been buried. They found pieces of tarp, duct tape, and two shoes identified as belonging to the victim.

After the close of the prosecution's case, appellant was called as a witness by his attorney. He conceded that, on the night in question, he had indeed shot and killed George. He explained that, on that evening, he, George, Hof, and his wife Lindsey, were all drinking at his home, in the course of which they started arguing about cars, including whether (1) a Cadillac El Dorado was a two-door or four-door car and (2) any other "young people" in the area drove Mercedes, besides appellant. This led to further arguments between appellant and George and the former's request that George leave, which, with his fists allegedly clenched, the latter declined to do. Appellant reiterated his request that George leave his apartment, to which George responded: "You are going to have to fucking move me from here." Appellant "kept asking him to leave politely over and over again and he just kept refusing" but then yelled at appellant: "You better go get your fucking gun" and took a step toward appellant. Appellant then stood up from the couch where he had been sitting, pulled out his gun, cocked it, and asked the other people to leave the room, which they did. Then, when George started moving toward appellant, the latter raised his gun and fired it, killing George.

Appellant then left the house, but returned shortly thereafter with his cousin, Richard Steele. The two of them decided to "cover this up." There followed, as related above, the various "cover ups," including appellant and Hof first burying George's body, throwing away the barrel of the gun, cutting off the bloody portions of the carpet and putting them into garbage bags. Later they met with two persons who advised them how to dispose of the body permanently in the Eel River, which appellant, his father and cousin, and Nathaniel Willis then did, after which they burned the clothes they were wearing. The next day, appellant was interviewed by the sheriff's investigators, and denied that anything untoward had happened to George.

5

On July 6, 2011, an information was filed count 1 of which charged appellant with first degree murder of George; that count also included four special allegations that appellant personally used a firearm causing great bodily injury and death. (Pen. Code, §§ 187, subd. (a), 1203.06, subd. (a)(1), 12022.5, subd. (a)(1) and 12022.53, subds. (b), (c), and (d).) Count 2 charged appellant with making criminal threats to Hof on January 22. (Pen. Code, § 422.) After a several-week jury trial, the important testimony of which is summarized above, appellant was found guilty of the second degree murder of George and of making criminal threats to Hof, as alleged. Several of the special allegations were also found to be true.

On April 10, 2012, appellant was sentenced to 15 years to life on the first count, 25 years to life on the firearm enhancement, and two years on the second count, i.e., making criminal threats.

On May 24, 2012, appellant filed a timely notice of appeal.

### III. DISCUSSION

Appellant presents only one issue for review, i.e., did the trial court err in instructing the jury with, among many other instructions, CALCRIM No. 3472, which reads: "A person does not have the right to self-defense if he or she provokes a fight or a quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.)

We find no error in the trial court's inclusion of this instruction. First of all, this one-sentence instruction was one of four given regarding, in whole or in part, the issue of self-defense. The others given were CALCRIM Nos. 505, 510, and 3475. Two of those, i.e., CALCRIM Nos. 505 and 3475 were specifically requested by defense counsel, and she expressed no objection to No. 510. The only one she objected to was CALCRIM No. 3472, and she did so only briefly, stating: "The objection is that it doesn't reflect the state of the evidence."

The court then allowed the prosecutor to respond, which he did by saying: "As succinctly as I can, your Honor, I believe it, in fact, does. The state of the evidence is that there's a verbal argument taking place between—per the defendant, between he and Jerry George. The defendant pulled a gun on Jerry George. He escalated it into a

6

situation necessitating or creating a situation where Jerry George might act in self-defense. He's the one that escalated it into a fight; and at that point, Jerry George had a legal right to defend himself. And he can't, then, subsequently after pulling a gun on someone when someone actually allegedly tries to take the gun from them say that when he shot that person, he was acting in self-defense. He, in fact, created the scenario where he gets to kill Jerry George per his version of events."

The court then commented: "Sure. 3472 is a correct statement of the law and I think there is sufficient basis in which, depending on how you view the evidence, to give 3472. So the Court will give 3472 as requested."

Defense counsel offered no response to either of these statements. Nor, in his brief to us, does appellant cite much less discuss the one reported authority which addresses the argument that the giving of that instruction was error. In *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381 (*Olguin*), the court said: "Without objection, the trial court instructed the jury with a series of CALJIC self-defense instructions which included CALJIC No. 5.55. [Now CALCRIM No. 3472.] Counsel were specifically asked if they had any objection to this instruction and said they did not. Mora [one of the appellants] now argues the instruction was erroneous as a matter of law because it does not require a specific intent to create a self-defense pretext for assault, and because it was inapplicable to the facts of the case.

"We agree the instruction had no antecedent in the facts of this case. Neither we nor the Attorney General can find facts that would support it. But we are mindful of the trial court's unique position for determining such issues: 'A trial judge's superior ability to evaluate the evidence renders it highly inappropriate for an appellate court to lightly question his determination to submit an issue to the jury. A reviewing court certainly cannot do so where, as here, the trial court's determination was agreeable to both the defense and the prosecution.' (*People v. McKelvy* (1987) 194 Cal.App.3d 694, 705 [lead opn. of Kline, P. J.].)

"Nor are we convinced the instruction had any bearing on the outcome of the trial. It was part of a packet of a dozen self-defense instructions, some of which were mutually

7

exclusive. It was obvious to anyone that not all of those instructions could apply to the case, and the jurors were specifically instructed they were to 'Disregard any instruction which applies to facts determined by you not to exist.' (CALJIC No. 17.31.) By all appearances, they understood their charge in this regard."

"Mora suggests the instruction might have kept the jury from evaluating his self-defense claim, but we don't see how. This very same argument about the same instruction was made—and rejected—in *People v. Crandell* (1988) 46 Cal.3d 833 [(*Crandell*), overruled on other grounds in *People v. Crayton* (2002) 28 Cal.4th 326, 364-365], where the court concluded, 'we are confident the jury was not sidetracked by the correct but irrelevant instruction, which did not figure in the closing arguments, and we conclude that the giving of the instruction was harmless error.' [Citations.] So do we." (Fns. omitted.)

For several reasons, we have no difficulty in rejecting appellant's argument—again, his sole argument on this appeal—that the giving of CALCRIM No. 3472 was error. The first reason is that, unlike the situation in *Olguin* and *Crandell*, the facts here make clear that the jury could well have found that appellant may have been provoking "a fight or a quarrel" with George with the intention of trying to see if he could create enough tension between them to provoke George to take some action which might justify his taking out, cocking, and then firing the pistol he was carrying in his waist. Which is precisely what happened. Thus, per his cousin, Richard Steele, appellant became "kind of . . . irritated" during the course of his argument with George, an irritation which may have derived from appellant's earlier suspicions that George might have stolen "stuff out of his safe."

Hof testified that he, also, had tried to get appellant to "calm down." Neither he nor appellant's cousin succeeded, which led to the shooting. Hof also testified that, immediately after the shooting, appellant said: "I don't have to deal with that nigger no more. I killed him." This statement is certainly consistent with appellant having provoked the fight.

8

Thus, the point of CALCRIM No. 3472 was, unlike the situation in *Olguin*, directly relevant here: there was, in fact, evidence in the record that appellant was, at least in part, provoking "a fight or quarrel" which led to the shooting of George. Appellant is thus incorrect when he argues that "there was no evidence in the record that appellant provoked a fight with Mr. George as an excuse to use force." There may have been no testimony as to appellant's *motive* for behaving threateningly to George, but there certainly was evidence in the record that both men were behaving threateningly toward the other. Indeed, appellant acknowledges such when he states in his opening brief that several witnesses testified "that the argument became heated with both Mr. George and appellant very angry and shouting at each other." And, of course, appellant was the one who was—and apparently always was—armed.

Further, the law is clear that: "A party is entitled to a requested instruction if it is supported by substantial evidence." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049; see also *People v. Flannel* (1979) 25 Cal.3d 668, 684, superseded on other grounds by statute as stated in *In re Chrisitan S.* (1994) 7 Cal.4th 768, 777 and 5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 674, pp. 1040-1041.)

Lastly, the holdings of our Supreme Court in *Crandell* and of our colleagues in the Fourth District in *Olguin* are also relevant here: even assuming there were insufficient factual bases for the inclusion of CALCRIM No. 3472 among the several instructions given by the court relating to self-defense, appellant makes no showing nor offers any reasonable argument in his briefs to us as to why any such error was harmful to his defense in this case. He does note that the prosecutor alluded, albeit briefly, to the substance of this instruction, but fails to note that this reference composed just a few lines in that counsel's arguments to the jury. That argument consumed over 30 pages of the reporter's transcript, and stressed appellant's obvious dislike of his "nigger" neighbor, his behavior toward George on the night in question, and his oversight of the disposal of George's remains after the killing. In short, CALCRIM No. 3472 played an extremely minimal part of the prosecutor's argument to the jury, and thus any error in giving it was clearly harmless.

9

## IV.  DISPOSITION

The judgment of conviction is affirmed.

 

_____
Haerle, Acting P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10